O. B. OBERHANSLY, Dennis Wilcox and Robert May, Plaintiffs and Appellants,

v.

Don B. EARLE, Betty Earle and Rainbow Properties Corporation, a Utah Corporation, Defendants and Respondents.

No. 14820.

Supreme Court of Utah.

Dec. 21, 1977.

---

1. See also, *Campbell v. Clark*, 159 Cal.App.2d 439, 324 P.2d 55, 58 (1958).

Robert M. McRae, Salt Lake City, George E. Mangan, Roosevelt, for plaintiffs and appellants.

Reese C. Anderson, Salt Lake City, for defendants and respondents.

MAUGHAN, Justice:

Before us is a judgment of the District Court. The court held the agreement and actions between the parties were too vague and conflicting to constitute a valid contract. The court awarded plaintiffs the sum of $2,040.93 as equitable relief. Plaintiffs appeal, we affirm. Costs to defendants.

On December 5, 1974, defendants, as buyer, and plaintiffs as seller, signed an Earnest Money Receipt and Offer to Purchase Form (hereafter referred to as agreement). For a purchase price of $6,000.00, buyers were to obtain the "distributorship for Schlitz, Miller and Hamms Beer and RC Cola and Frostie Root Beer." The phrase "All stock in Basin Dist. Co. included" was handwritten in immediately following. Five hundred dollars down was paid at that time and monthly payments of $500.00 each were to begin on January 10, 1975. Possession of the distributorship was to be given on December 6, 1974, at which time the inventory would be counted and paid for in cash by buyers. The agreement recited the $6,000.00 purchase price was to "be treated as a note and mortgage on unpaid balance and will still be owed regardless of what buyer does with dealership." Next followed a promise by sellers to provide signed agreements with the beer companies to show exclusive distribution rights in the

area. Below the signatures of the parties was the handwritten provision "Betty (buyer) will pay sellers also for $1,000.00 deposit on truck if Betty chooses to continue lease on truck." Below this was the handwritten provision that buyers could rent the warehouse for $350.00 per month if they wished.

It appears the parties did count the inventory on December 6, 1974, and buyers made partial payment of $1,500.00 in cash at that time. However, buyers did not assume control of the business until about December 17, 1974, and thereafter operated it for only about two months. Despite repeated requests, sellers never provided the agreements showing exclusive distributorship rights. After about February 3, 1975, the Schlitz supplier refused to deliver any more beer to Basin Distributing Co. Buyers ascertained that Schlitz accounted for the majority of their sales and that they could not operate profitably without it.

During the time buyers operated the business there was never any transfer of capital stock from seller to buyer nor any change of directors or officers of the corporation. Additionally, buyers never obtained the state license required to distribute alcoholic beverages but instead relied on a seller's promise to continue the license in his name.

On these facts, the trial judge, held the agreement was ambiguous, uncertain, conflicting, and unenforceable as an agreement of the parties, and that subsequent dealings between the parties were also too ambiguous to create a binding contract. He granted equitable relief to sellers of $4,040.93, which was later reduced to $2,040.93 since buyers had already paid $500.00 down and $1,500.00 for the inventory. On appeal, appellant seeks to have the handwritten agreement enforced.

We begin by noting that on appeal the decision of the trial court is entitled to a presumption of validity. We are required to view the evidence and any inferences drawn therefrom in the light most favorable to sustaining the decision.[1]

It is a basic principle of contract law there can be no contract without a meeting of the minds of the parties which must be spelled out either expressly or impliedly with sufficient definiteness to allow enforcement.[2] The burden of proving the existence of a contract is on the party seeking enforcement of it.[3] Of course the intentions of the parties are controlling and normally those intentions will be found from the instrument itself. If a writing is not sufficient to establish meaning however, resort may be had to extraneous evidence manifesting the intentions of the parties.[4]

Applying these principles to the case at hand, we first decide that the written agreement is ambiguous and conflicting. The primary problem is to determine just what the parties intended to sell and buy. Sellers first purport to sell the distributorship and the stock in Basin Distributing Company, but we are left to speculate about just what these terms mean. As noted above there were separate provisions relating to the inventory, warehouse and truck if buyer wanted to use them.

The term "stock" could mean either stock in trade or capital stock. However, either possible meaning would conflict with other provisions in the agreement. The stock in trade was clearly covered by the inventory provision. If it meant capital stock it conflicted with the provisions covering all the capital assets. There is no further explanation as to how to resolve these conflicts. There is also nothing to indicate what the distributorship was or why it might have been worth $6,000.00.

Looking to the conduct of the parties does little to clarify the situation. Buyer may have believed that the purchase price was for the signed agreements with the beer companies showing exclusive dis-

1. *Cutler v. Bowen,* Utah, 543 P.2d 1349 (1975).

2. *Valcarce v. Bitters,* 12 Utah 2d 61, 362 P.2d 427 (1961).

3. *B & R Supply Company v. Bringhurst,* 28 Utah 2d 442, 503 P.2d 1216 (1972).

4. *Bennett v. Robinson's Medical Mart, Inc.,* 18 Utah 2d 186, 417 P.2d 761 (1966).

tribution rights since he repeatedly asked sellers for them. Under the circumstances however, it is difficult to believe that sellers intended them to have any importance. Sellers failed to produce them or give any reason for such failure. Indeed, when Schlitz refused to supply any more beer there was no action or explanation by sellers. In this context, the term distributorship has no meaning whatever in the agreement which would carry any value. Neither party showed any concern about the capital stock since it was never transferred, and there was no change of officers or directors. Were we to enforce the agreement, we would have no idea what the rights of the parties would be under it. Sellers have not met their burden of showing that a meeting of the minds existed.

■ Seller also contends he should be given judgment on certain checks given him by buyers which were dishonored by the bank. Even assuming that sellers met the technical requirements of the law for judgment on dishonored checks, such relief would be futile here. The trial judge made an equitable apportionment of damages to seller, based on the conduct of the parties and their respective positions, at the time of the trial. Since we agree with this apportionment, it would be useless to enforce sellers claim on the checks as this would simply require a further modification of damages.

Buyers argue for a reduction in damages due to the change in the inventory between December 6, 1974, and December 17, 1974, when they took control of the business. This is purely a factual question and we find no evidence that the trial judge was not aware of the situation when determining damages. We accordingly decline to reduce them.

CROCKETT and WILKINS, JJ., concur.

ELLETT, C. J., and HALL, J., concur in result.