**F.C. STANGL, III, an individual dba F.C. Stangl Construction Company, Plaintiff and Appellee,**

v.

**ERNST HOME CENTER, INC., a Washington corporation, Defendant and Appellant.**

No. 950187–CA.

Court of Appeals of Utah.

Oct. 30, 1997.

Julianne P. Blanch, Salt Lake City, and Roger J. Kindley, Seattle, WA, for Appellant.

Stephen G. Crockett, Stephen T. Hard, Nanci Snow Bockelie, and Rebecca S. Parr, Salt Lake City, for Appellee.

Before DAVIS, BENCH and JACKSON, JJ.

DAVIS, Presiding Judge:

Defendant Ernst Home Center, Inc. (Ernst) appeals the trial court's judgment in favor of plaintiff F.C. Stangl, III (Stangl). We reverse.

## FACTS

Generally, defendant accepts the trial court's findings of fact. Thus, we recite the facts directly therefrom.

Stangl has been in the real estate development and construction business for numerous years. Since 1979, Stangl had an ownership interest in the property at issue here, the Jordan Valley Plaza ("Plaza"), in West Jordan, Utah. In 1981, Stangl sold the Plaza to Roger Brockbank, retaining for himself two contiguous parcels of land that he wanted to develop. Stangl remained the guarantor of Brockbank's indebtedness to the lender, whose interest was later transferred to Aetna.

Ernst, a Washington corporation, is in the retail home improvement business. In the early part of 1987, Ernst learned that space in the Plaza was available due to the departure of an anchor tenant. Ernst conducted a site feasibility study, which was completed in May 1987. The study indicated that the Plaza site would be economically marginal. Ernst did nothing further at that time.

Brockbank ultimately defaulted on the loan secured by the Plaza in September of 1987. Although Aetna notified Stangl of the default, it never made a demand on Stangl as guarantor of Brockbank's loan because Aetna believed that the value of the Plaza exceeded the loan amount. Aetna commenced a nonjudicial foreclosure, and Brockbank subsequently filed for relief under Chapter 11 of the Bankruptcy Code.

Due to Brockbank's default, Stangl foresaw a possible business opportunity and, in May 1988, had Steve Pruitt, his attorney, contact Ernst regarding its interest in the Plaza's anchor site. Pruitt contacted Mack DuBose, Ernst's vice-president in charge of real estate planning and development, who expressed interest in the site as a possible location for an Ernst store. Pruitt then sent DuBose certain documents pertaining to the Plaza. In this communication, Pruitt erroneously advised DuBose that Aetna was enforcing Stangl's guarantee of Brockbank's loan and, therefore, Stangl would possess the Plaza by late June.

In mid June, DuBose and other Ernst employees inspected the Plaza with Pruitt. After this inspection, DuBose told Stangl that Ernst would like to move forward with lease negotiations, with Ernst as the anchor tenant at the Plaza. Pruitt then sent Dubose a letter that outlined the basic terms of the proposed lease, including a time period, options, and rent. This letter informed Dubose that Stangl could provide Ernst with a turnkey building ready for the installment of fixtures by October 1, 1988. Certain important items, however, were not included in this letter, such as Ernst's obligation to continuously operate as the anchor tenant in the Plaza, whether subletting was permissible, or the effect of Stangl's failure to perform under the lease.

DuBose replied to Pruitt's letter by fax and carefully addressed all but one item contained in Pruitt's letter. DuBose agreed that Stangl needed to provide a turnkey building by the October date. DuBose indicated that the parties would be able to reach an agreement regarding the lease terms, stating that they needed to complete a binding "Offer to Lease" and that the final step of drafting the actual lease would consume approximately three to five weeks.

DuBose sent Stangl another letter outlining the lease terms acceptable to Ernst. DuBose stated that "[t]he lease contemplated by this proposal shall be based on the ... terms and conditions" set forth in the letter. The trial court found that, although not expressly stated, this letter was a "proposed 'binding Offer to Lease.' " Stangl rejected the offer and forwarded a counteroffer. DuBose then sent yet another letter to Stangl which contained a form lease highlighting certain items

that needed to be resolved by the parties. This letter contemplated that an "Offer to Lease" had yet to be made. DuBose forwarded the letter to Ernst's president for approval as an "Offer to Lease," telling him that construction on the project "must begin by 8/15/88."

Meanwhile, Stangl purchased an option agreement from Brockbank for $1000. This option agreement gave Stangl the right to buy the Plaza for $1,150,000. Under the agreement, Brockbank had to get the bankruptcy court to release the property, cure all title defects, and convey the property by warranty deed. At the same time, Stangl offered to purchase Aetna's interest in the trust deed on the Plaza. Aetna rejected Stangl's offer, but later accepted Stangl's second offer for $900,000. Stangl's offer to Aetna depended upon Stangl's approval of the title and the bankruptcy court's approval.

During July 1988, Ernst's architects communicated with Stangl's employees about construction issues. Additionally, Stangl applied to the City of West Jordan Planning Commission for a conditional use permit, a site plan review, and permission to place a sign at the Plaza. Stangl's application to the West Jordan Planning Commission indicated that the request was for an Ernst store. Along with Stangl's application, DuBose wrote a letter to West Jordan's City Manager informing the City Manager of Ernst's intent to lease the anchor tenant space at the Plaza. Ernst's Director of Construction attended the West Jordan City Planning Commission hearing on the application on behalf of Ernst and told the commission of Ernst's intent to lease space at the Plaza. Ernst's financial statement was also forwarded to Pruitt at this time.

In mid July, Stangl sought approximately $1.1 million from Valley Bank to buy the Plaza, remodel the anchor site for Ernst, and remodel other portions of the Plaza. Two of Stangl's existing loans were also included in the Plaza loan package; these two loans were approved earlier for the development of two parcels of property, adjacent to the Plaza, owned by Stangl. The two parcels were used as collateral for the Plaza loan in addition to the Plaza property. Valley Bank approved Stangl's loan, which was closed in late July, although the funds were withheld until Stangl acquired title to the Plaza.

In the early part of August, DuBose and Pruitt had two phone conversations. DuBose told Pruitt that the Plaza project had been approved by Ernst's management and that Pruitt should expect a letter of intent. The parties did not, however, intend for either of the earlier letters to serve as the letter of intent. To the contrary, after the phone conversation with Pruitt, DuBose began to edit an earlier letter to serve as the letter of intent.

During this time, Stangl's legal counsel made substantial changes to the form lease that DuBose had earlier sent to Stangl; Stangl forwarded the modified form lease to DuBose. Based on these substantial modifications, DuBose did not send Stangl an Offer to Lease and there was no further communication between the parties until the latter part of August.

Stangl and Brockbank completed the sale of the Plaza. Because of several tax liens against the property, Brockbank was unable to deliver a satisfactory title or warranty deed. Notwithstanding, Stangl waived this deficiency, upon which the option agreement was conditioned, and agreed to pay the amounts necessary to eliminate the tax liens. The option agreement that Stangl had entered into with both Brockbank and Aetna provided that Stangl could have forfeited the right to purchase the Plaza property based on the unsatisfactory title and warranty deed. Stangl, however, based on Ernst's assurances that it would lease the space, went forward with the purchase.

In late August, DuBose sent Stangl a copy of a lease that DuBose said Ernst was ready to execute. Stangl replied by sending DuBose the proposed lease with several modifications. Stangl did not believe that these proposed changes would jeopardize the negotiations with Ernst. DuBose, however, felt differently, and responded by informing Stangl that several issues remained unresolved and if these key issues were not settled, negotiations between the parties would

cease. A meeting between the two was set for mid September.

DuBose and his replacement, Ellis Kantor, met with Stangl on the scheduled date.[1] There were several issues the parties hoped to resolve: rent abatement, Ernst's ability to sublet, the responsibility for providing and paying insurance, and whether Ernst was required to operate continuously. Although at this time Ernst expressed concern about resolving these issues, Stangl had not understood them to be of particular importance during the parties' earlier negotiations. Stangl told DuBose and Kantor how he would like to resolve the issues, but assured them that they would be resolved in Ernst's favor if necessary.

The day after the parties' Salt Lake City meeting, DuBose left Ernst's employ. On this same day, Thomas Stanton, Ernst's Senior Vice–President of Operations, told Kantor that the Plaza project was on hold. Stangl, who was not informed of this development, called Ernst for an update on the Plaza negotiations. At this time, both Kantor and Stanton told Stangl that Ernst had postponed DuBose's projects. Stanton also mentioned Ernst's need to prepare an economic study before going further with the Plaza project; this was the first Stangl had heard of the need for such a study. Stanton sent Stangl a letter in late September formally informing Stangl that Ernst would not be the anchor tenant in the Plaza.

Stangl filed suit in May, 1989. In relevant part, Stangl's complaint alleged that Ernst was liable to Stangl for damages based on the doctrine of promissory estoppel because Stangl had purchased the Plaza in reliance on Ernst's representations that it would lease the anchor tenant space at the Plaza. The trial court agreed and held that despite the statute of frauds, promissory estoppel was available as a theory of recovery.

In its findings, the trial court determined that the only reason Stangl purchased the Plaza property was because of the business opportunities available with Ernst as the anchor tenant. The trial court stated,

> If Stangl had wanted to acquire the property for his own account or for speculative purposes, he would have waited to acquire the Plaza at the foreclosure of the trust deed.[2] The reason that Stangl acquired an option to purchase the Plaza from ... Brockbank[ ] and simultaneously made an offer to purchase the trust deed from Aetna was to facilitate the speedy acquisition of the property to enable Stangl to meet Ernst's intended fixturing date of October 1, 1988.

The trial court also found that although Ernst placed the project on internal hold as early as July, Ernst never told Stangl that the project might be postponed. Ernst moved forward with its negotiations with Stangl as if everything were on track for the October 1 fixturing date. Because of the parties' "fast track" negotiations, the trial court concluded that it was reasonable for Stangl to close on the purchase of the Plaza property, particularly in light of DuBose's August phone conversations with Pruitt, when "DuBose had signaled and represented ... that Ernst would be the anchor tenant at the Plaza." The trial court determined that "[w]hile DuBose could not have anticipated this precise step [Stangl's purchase of the Plaza property], he could have and should have reasonably anticipated that Stangl would make legal and economical commitments in furtherance of the project to accommodate an October 1 possession date." The trial court further found that had Stangl known that Ernst needed to do a feasibility analysis before committing to a lease, Stangl would not have purchased the Plaza. Regarding the lease negotiations in late August, the trial court determined that Stangl was "entirely and reasonably justified" in believing that his modifications to the lease would not jeopardize the negotiations. The trial court found that after the September meeting with DuBose and Kantor, Stangl reasonably expected a binding lease from Ernst by September 23, 1988.

---

1. Immediately before the meeting in Salt Lake City, DuBose tendered his resignation to Ernst. Stangl was not told of this development.

2. It is not clear how the trial court reached this conclusion.

Based on its findings, the trial court concluded that the parties did not enter into either an oral or written contract. Furthermore, it is undisputed that the contract contemplated by the parties' negotiations is subject to the statute of frauds. Notwithstanding, the trial court concluded that Ernst, through DuBose, promised to enter into a lease with Stangl and that "[i]njustice can only be avoided in this case by enforcing Ernst's promise to lease the anchor space under promissory estoppel." Thus, the trial court allowed recovery under a theory of promissory estoppel and awarded Stangl his out-of-pocket expenses in the amount of $331,391. Ernst appeals.

## ISSUE AND STANDARD OF REVIEW

■ The dispositive issue here is whether promissory estoppel precludes Ernst from asserting the statute of frauds as a defense. This issue is a question of law.[3]

> Where the issue is a question of law, ... appellate review gives no deference to the trial judge's ... determination, because the appellate court has "the power and duty to say what the law is and to ensure that it is uniform throughout the jurisdiction." The reviewing court therefore applies a "correctness" standard, deciding the matter for itself.

*Drake v. Industrial Comm'n*, 939 P.2d 177, 181 (Utah 1997) (citation omitted) (quoting *State v. Pena*, 869 P.2d 932, 936 (Utah 1994) (citation omitted)).

## ANALYSIS

The trial court concluded that Ernst was estopped from asserting the statute of frauds as a defense based on Ernst's representation throughout its lease negotiations with Stangl that it would lease the anchor tenant space at the Plaza. Ernst, however, argues that the doctrine of promissory estoppel is not available under the facts of this case and, therefore, the trial court's ruling is contrary to Utah law. We agree.

■ "Statutes of frauds are intended to bar enforcement of certain agreements that

the law requires to be memorialized in writing." *Colonial Leasing Co. v. Larsen Bros. Constr. Co.*, 731 P.2d 483, 486 (Utah 1986). The applicable statute of frauds states: "Every contract for the leasing for a longer period than one year ... shall be void unless the contract, or some note or memorandum thereof, is in writing subscribed by the party by whom the lease or sale is to be made." Utah Code Ann. § 25-5-3 (1995); *see also Commercial Union Assoc. v. Clayton*, 863 P.2d 29, 33 (Utah Ct.App.1993) (stating section 25-5-3 "explicitly and specifically governs contracts for the leasing of land"). "An agreement to enter into a future real estate lease for a period longer than a year is within the Statute of Frauds, § 25-5-3, and must be in writing to be enforceable." *SCM Land Co. v. Watkins & Faber*, 732 P.2d 105, 107 (Utah 1986). Therefore, any agreement by Ernst that it would enter into a twenty-five year lease with Stangl falls within the section 25-5-3 statute of frauds and would ordinarily be void because it was not in writing and subscribed by Ernst.

■ Notwithstanding the language of section 25-5-3, however, Stangl claims that the doctrine of promissory estoppel prevents Ernst from availing itself of the statute of frauds under the facts of this case. The Utah Supreme Court has defined promissory estoppel, stating:

> "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires."

*Tolboe Constr. Co. v. Staker Paving & Constr. Co.*, 682 P.2d 843, 845 (Utah 1984) (quoting Restatement (Second) of Contracts § 90 (1981)); *accord Andreason v. Aetna Cas. & Sur. Co.*, 848 P.2d 171, 175 (Utah Ct.App.1993). In situations involving the purchase or lease of real property, however, Utah cases have narrowly circumscribed the application of promissory estoppel to the

---

**3.** Based on our decision, we do not address whether Stangl adequately established the elements of promissory estoppel absent the effect of the statute of frauds.

statute of frauds. A defendant is estopped from asserting the statute of frauds as a defense only when he or she has expressly and unambiguously waived the right to do so.

*Ravarino v. Price,* 123 Utah 559, 260 P.2d 570 (Utah 1953), involved the sale of real property. The defendants, Harry Price, his wife, and his sister, Mrs. Marcus Parr, were the owners of two tracts of land that were listed for sale. Plaintiff offered to purchase the property through the real estate broker, Lewis Hansen. The defendants accepted plaintiff's offer, and Mrs. Price and Mrs. Parr both signed the "Earnest Money Receipt and Agreement" (agreement). *Id.* at 572, 260 P.2d 570. Although Mr. Price did not sign the agreement, he manifested to Hansen that he had every intention of doing so. Hansen called Mr. Price on several occasions to see if he was still willing to execute the agreement; Mr. Price repeatedly assured Hansen that he would sign the document. *See id.* at 573, 260 P.2d 570.

During one particular conversation, Hansen told Mr. Price that the plaintiff wished to purchase a small strip of land bordering the defendants' land, but only if the transaction between the parties was completed. Again, Mr. Price assured Hansen that the deal would go through. Based on Mr. Price's assurances, the plaintiff bought the land bordering that of the defendants. *See id.* at 573–74, 260 P.2d 570.

Despite Mr. Price's earlier promises that he would sign the agreement, he later refused to do so. Consequently, the plaintiff sued for specific performance, to which the defendants responded by asserting the statute of frauds. The trial court held that the defendants were estopped from asserting the statute of frauds and determined that the plaintiff had purchased the adjoining strip of land only because of Mr. Price's repeated promises to sign the agreement. *See id.* at 574, 260 P.2d 570.

The Utah Supreme Court considered whether the defendants were barred from using the statute of frauds as a defense based on Mr. Price's repeated promises to complete the sale. The court stated: "Promissory estoppel is historically rooted as a substitute for consideration [and] is applied where the promise of the promisor as to his future conduct constitutes the intended abandonment of an existing right on his part." *Id.* at 575, 260 P.2d 570 (citations omitted). The court found that " 'there was absolutely no statement upon the part of the defendants of an intended abandonment of an existing right. It was merely an acquiescence in the plaintiff's proposition.' " *Id.* at 577, 260 P.2d 570 (citation omitted). Therefore, the court refused to bar the defendants from asserting the statute of frauds as a defense and instead applied "the general rule . . . that an estoppel will not arise simply because of a breach of promise as to future conduct or because of a disappointment of expectations on an executory agreement." *Id.*

Three years later, the supreme court decided *Easton v. Wycoff,* 4 Utah 2d 386, 295 P.2d 332 (Utah 1956). There, the plaintiff moved his gun factory from Colorado to Utah based on the defendant's representation that he owned the building in question and would lease it to the plaintiff at an agreed upon rental. The parties agreed on the lease terms and the defendant "promised to have the lease agreement drawn up by his attorney to comply with the requirements of the Statute of Frauds." *Id.* 295 P.2d at 333.

The plaintiff later discovered that the defendant was not the true owner and had actually refused to buy the building from the owner after he had made the promise to the plaintiff. The plaintiff, however, was not aware of this fact until he had moved all his equipment into the building. After the facts came to light, the plaintiff tried to negotiate a similar lease with the rightful owner of the building, but when she refused, the plaintiff was forced to accept less favorable lease terms. *See id.*

The plaintiff sued the defendant for damages equaling the difference between the proposed lease with the defendant and the lease the plaintiff ultimately entered into. The defendant, however, filed a motion for summary judgment, arguing that the plaintiff's claim was barred by the statute of frauds. The trial court agreed and granted the defendant's motions for dismissal and summary judgment. *See id.*

On appeal, the Utah Supreme Court considered whether "the reliance of the [plaintiff] upon the promise of the [defendant] to execute a written lease in the future estop[s] the [defendant] to set up the Statute of Frauds as a defense to an action upon the contract." *Id.* The court set forth the then current status of the law regarding whether promissory estoppel can bar the defense of the statute of frauds:

"The doctrine of promissory estoppel has . . . been extended to permit recovery on the contract by one who has relied to his detriment on the promise of the defendant to execute and deliver a sufficient memorandum. A mere refusal to perform an oral agreement within the Statute, however, is not such fraud as will justify a court in disregarding the Statute even though it result[s] in hardship to the plaintiff."

*Id.* at 333–34 (citation omitted) (emphasis omitted). The court reconciled the two statements, stating, "The mere refusal to execute a written contract as agreed does not constitute 'fraud' within the rule that the Statute of Frauds will not be enforced where the effect would be to perpetrate a fraud, and to hold otherwise would, in effect, completely nullify the Statute of Frauds." *Id.* at 334 (citation omitted). Additionally, promissory estoppel will bar the defense of the statute of frauds only when " '[t]he acts and conduct of the promisor . . . so clearly indicate that he does not intend to avail himself of the statute that to permit him to do so would be to work a fraud upon the other party.' " *Id.* at 335 (citation omitted).

Applying the stated law to the facts before it, the supreme court held that the defendant was not estopped from asserting the statute of frauds as a defense. The court stated that because there was no substantial action by the plaintiff upon the defendant's earlier promise to execute the written lease, the plaintiff was only damaged in the sense that he suffered the "loss of a good bargain." *Id.* at 335. The fact that the defendant had merely refused to enter into a written lease after earlier promising to do so was insufficient to invoke the doctrine of promissory estoppel.

*McKinnon v. The Corporation of the President of the Church of Jesus Christ of Latter–Day Saints,* 529 P.2d 434 (Utah 1974), is the last of the principal promissory estoppel/statute of frauds cases. There, the plaintiff sold a 480 acre parcel of coal-bearing property to the defendant and agreed to withdraw an application with the Bureau of Land Management (BLM) to lease a tract of property adjacent to the purchased property with the understanding that the defendant would assign a portion of the leased property to the plaintiff for a right-of-way if the defendant obtained the BLM lease. *See id.* at 435.

The defendant later obtained the BLM lease, but the parties never negotiated the right of way. Thirteen years later, the plaintiff filed suit against the defendant for the defendant's failure to reserve a right of way on the plaintiff's behalf. The defendant argued that there was no written or oral agreement to this effect and, therefore, the plaintiff's claims were barred by the statute of frauds. The plaintiff, however, contended that the defendant was estopped from using the statute of frauds as a defense. *See id.* at 436.

*McKinnon* reiterated the rule stated in *Ravarino:*

[A]n estoppel will not arise simply because of a breach of promise as to future conduct or because of a disappointment of expectations of an executory agreement. An exception is recognized when a misrepresentation as to the future operates as an abandonment of an existing right of the party making the misrepresentation, i.e., the promise as to future conduct must constitute a manifestation that the promissor will abandon an existing right which he possesses. Fraud, generally, cannot be predicated upon the failure to perform a promise or contract which is unenforceable under the statute of frauds, for the promissor has not, in a legal sense, made a contract; and therefore, he has the right, both in law and equity, to refuse to perform.

*Id.*

*McKinnon* recognized the limited application of the doctrine of promissory estoppel to the statute of frauds:

In *Easton v. Wycoff* this court stated that the doctrine of promissory estoppel had been extended, *in a limited form,* to those cases concerned with the ... Statute of Frauds, where the promise as to future conduct constituted the intended abandonment of an existing right of the promissor. However, a mere promise to execute a written contract and a subsequent refusal to do so is insufficient to create an estoppel, although reliance is placed on such a promise and damage is sustained as a consequence of the refusal. *The acts and conduct of the promissor must so clearly manifest an intention that he will not assert the statute that to permit him to do so would be to work a fraud upon the other party.*

*Id.* at 436–37 (footnote omitted) (emphasis added).

Because the defendant in *McKinnon* had not clearly and unequivocally represented that it would not avail itself of the defense of the statute of frauds, the court rejected the plaintiff's argument that the defendant was estopped from asserting it as a defense. *See id.* at 437. Accordingly, because the agreement fell within the statute of frauds and was not in writing, the court affirmed the lower court's ruling that the agreement was void. *See id.*

Plaintiff here, however, suggests that this line of cases retain marginal efficacy for the reasons set out in *Medesco, Inc. v. LNS Int'l, Inc.,* 762 F.Supp. 920 (D.Utah 1991).[4] There, the plaintiffs and the defendants entered into a written agreement in which defendant LNS International, Inc. (LNS) agreed to purchase 30,000 shares of Medesco's common stock. *See id.* at 921. In return, Medesco agreed that LNS could represent Medesco and its product in northern California. *See id.*

However, after this agreement between the two parties was executed, the individual defendants sought to renegotiate the agreement whereby a similar agreement[5] would be executed. The significant difference be-

tween the agreements was the parties, with the defendants individually and collectively as Soeng Ting Group executing the new agreement, as opposed to LNS. *See id.* However, only one of the individual defendants actually signed the new agreement. *See id.* at 922. Citing defendants' failure to enter into the second agreement, plaintiffs claimed they suffered damages and filed suit alleging breach of an oral contract. Because the other defendants had never signed the second agreement, and thus there was no valid written agreement between the parties, the defendants argued that the plaintiffs' claims were barred by the statute of frauds set out in section 70A–8–319 of Utah's Uniform Commercial Code (UCC).[6] *See id.* at 923. The plaintiffs, however, claimed that the defendants were estopped from using the statute of frauds as a defense based on their earlier promises. *See id.* at 924.

The court concluded the UCC provided that promissory estoppel could be used to bar a defendant from asserting the statute of frauds as a defense. Section 70A–1–103 of the UCC, entitled "Supplementary general principles of law applicable," stated, "Unless displaced by the particular provisions of this act, the principles of law and equity, including the ... law relative to ... estoppel ... shall supplement its provisions." Utah Code Ann. § 70A–1–103 (1990). The trial court ruled, "Because § 70A–8–319 contains no language displacing the doctrine of promissory estoppel, the court concludes the doctrine may be invoked under this section to estop a party from asserting the statute of frauds as a defense." *Id.* at 924.

The court then reviewed *Ravarino, Easton,* and *McKinnon* and "how the Utah Supreme Court discussed what showing was required for a promissory estoppel theory to prevail against the statute of frauds." *Id.* at 925. The court determined that the application of promissory estoppel to the statute of frauds in those cases was not applicable to the case before the court since *Medesco* was a securities case and the three earlier Utah

---

**4.** *Medesco,* also relied upon by the trial court, applied Utah law.

**5.** Certain contract terms not relevant here were altered.

**6.** Utah's Uniform Commercial Code is codified in chapters 1 through 11 of Title 70A of the Utah Code.

Supreme Court cases concerned either the lease or sale of real property.[7]

Having distinguished *Medesco* from *Ravarino, Easton,* and *McKinnon,* the *Medesco* court, in dicta, continued its analysis of those cases. The court observed that *Ravarino, Easton,* and *McKinnon* relied on the earlier version of section 90 of the Restatement of Contracts, which provided: "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Restatement of Contracts § 90 (1932).

The current version of section 90 in the Restatement (Second) of Contracts has been applied by the Utah Supreme Court. *See, e.g., Southeastern Equip. Co. v. Mauss,* 696 P.2d 1187, 1188 & n. 1 (Utah 1985); *Tolboe,* 682 P.2d at 845. This version of section 90 states:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Restatement (Second) of Contracts § 90 (1981). The difference between the two is that the current version deletes the language "of a definite and substantial character" and limits damages to those "as justice requires," but not full compensatory damages. *See Andreason,* 848 P.2d at 175 n. 1.

The changes have little, if any, impact on *Ravarino, Easton,* and *McKinnon.* "The principle change from former § 90 is the recognition of the possibility of partial enforcement." Restatement (Second) of Contracts § 90 Reporter's Note (1981). "Partly

because of that change, the requirement that the action or forbearance have a 'definite and substantial character' is deleted; and provision is added for reliance by beneficiaries." *Id.* Thus, while the current section 90 has "infused a more flexible approach into both the substantive and remedial aspects of promissory estoppel," *Andreason,* 848 P.2d at 175, it has not affected prior case law which limits the application of promissory estoppel to the statute of frauds.[8]

The *Medesco* court finally suggests that *Ravarino, Easton,* and *McKinnon* "are of dubious precedential value given the confusion in these cases between the doctrines of equitable estoppel and promissory estoppel." *Medesco,* 762 F.Supp. at 925 n. 8. While it is true that *Ravarino* and *Easton* seem to blend the two doctrines,[9] *McKinnon* clearly and unequivocally sets out the circumstances under which a party may be promissorily estopped from asserting the statute of frauds as a defense.

For the foregoing reasons, we reject *Medesco*'s suggestion that *Ravarino, Easton,* and *McKinnon* are no longer good law.

Having distinguished these cases applying promissory estoppel to the statute of frauds in a real estate sale or lease case, the *Medesco* court, for the first time in this jurisdiction, applied section 139 of the Restatement (Second) of Contracts, which provides:

> (1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce the action or forbearance is enforceable *notwithstanding the Statute of Frauds* if injustice can be avoided only by enforcement of the promise. The remedy granted for breach is to be limited as justice requires.
>
> (2) In determining whether injustice can be avoided only by enforcement of the

---

7. We note that the UCC clearly provided for the application of the doctrine of promissory estoppel to the UCC statute of frauds. *See* Utah Code Ann. § 70A–1–103 (1997).

8. In *Andreason,* this court analyzed promissory estoppel under the Restatement (Second) of Contracts version of section 90. *Andreason* had nothing to do with the statute of frauds, and

footnote references to *Easton* and *Ravarino* therein make no mention of the application of promissory estoppel to the statute of frauds. *See Andreason,* 848 P.2d at 175 n. 1.

9. Indeed, *Ravarino* notes that the doctrine of equitable estoppel is "a limited application of the doctrine of promissory estoppel." 260 P.2d at 575.

promise, the following circumstances are significant:

(a) the availability and adequacy of other remedies, particularly cancellation and restitution;

(b) the definite and substantial character of the action or forbearance in relation to the remedy sought;

(c) the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence;

(d) the reasonableness of the action or forbearance;

(e) the extent to which the action or forbearance was foreseeable by the promisor.

Restatement (Second) of Contracts § 139 (1981) (emphasis added). The court reasoned that by adopting section 139, it could "balance the policies furthered by the doctrine of promissory estoppel and the particular statute of frauds in light of the particular facts of each case." *Medesco*, 762 F.Supp. at 926.

The trial court in this case followed *Medesco*'s reasoning and, in effect, applied many of the elements of section 139. Ernst argues that this approach is contrary to the law announced in *Ravarino, Easton,* and *McKinnon* and "would allow frustrated negotiators to claim promissory estoppel and seek damages for money spent in 'anticipation' of a possible contract." We agree.

"Just as the statute of frauds should not be used to perpetrate fraud[,] so, too, promissory estoppel should not be allowed to eviscerate the statute of frauds." *Medesco*, 762 F.Supp. at 926. If this court were to reject prior Utah case law and adopt section 139, parties to a contract negotiation could not rely on the protections afforded by the statute of frauds, thereby "eviscerating" it. Moreover, contract negotiators would never know at what point mere negotiations became a binding contract. Parties to contract negotiations should be entitled to rely on the statute of frauds absent a clear manifestation of intent to claim no reliance. A party concerned about the assertion of the statute of

frauds could easily protect itself by demanding written commitments before acting in reliance on the negotiations. However, if this court were to adopt the reasoning in *Medesco*, a party relying on the statute of frauds may, at some stage of negotiations, find itself entangled in the likes of section 139.

Applying the law to the facts at hand, we hold that the trial court erred in concluding that Ernst was estopped from using the statute of frauds as a defense. At no time did Ernst's conduct "clearly manifest an intention that [it would] not assert the statute [of frauds]." *McKinnon*, 529 P.2d at 437. To the contrary, even the trial court's conclusion of law establishes that "Ernst's form of an 'Offer to Lease' *expressly* contemplated a subsequent, written lease." (Emphasis added.) Moreover, Stangl was well aware that Ernst required a written agreement, which was clearly evidenced by the parties' written communication. Nevertheless, Stangl gambled that the negotiations would be successfully concluded. Furthermore, even though the trial court found that Ernst assured Stangl that it would enter into a lease with Stangl, "a mere promise to execute a written contract and a subsequent refusal to do so is insufficient to create an estoppel, although reliance is placed on such a promise and damage is sustained as a consequence of the refusal." *McKinnon*, 529 P.2d at 436–37. Accordingly, Ernst is not estopped from asserting the statute of frauds as a defense because it refused to conclude a lease that it had earlier promised to enter into. Because the parties' negotiations contemplated a twenty-five year lease falling within the statute of frauds, *see SCM Land Co.*, 732 P.2d at 107, the same is void because it was not in writing, *see* Utah Code Ann. § 25-5-3 (1995).

## CONCLUSION

The trial court's findings of fact and conclusions of law do not support the application of promissory estoppel to the statute of frauds. Promissory estoppel bars a defendant from asserting the statute of frauds as a defense only where the party has clearly and unequivocally represented that it would not

use it as a defense. Accordingly, because Ernst did not represent that it would not assert the statute of frauds as a defense, it is not estopped from doing so. Any alleged agreement between the parties is void under the statute of frauds. The trial court's judgment in favor of Stangl is reversed and judgment is entered in favor of Ernst.

BENCH and JACKSON, JJ., concur.