**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 12 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

HOMESTEAD GOLF CLUB, INC., a
Utah corporation,

      Appellee and Cross-Appellant,

v.

PRIDE STABLES, a Utah limited
partnership,

      Appellant and Cross-Appellee,

v.

VALLEY BANK AND TRUST
COMPANY,

      Third-Party Defendant.

Nos. 98-4211 and 98-4217

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 95-CV-484-J)**

---

Stephen B. Mitchell (Richard D. Burbidge with him on the briefs), Burbidge &
Mitchell, Salt Lake City, Utah, for the appellee and cross-appellant.

John G. Marshall, Marshall & Willis, Salt Lake City, Utah, for the appellant and
cross-appellee.

Before **LUCERO**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **ALLEY**, Senior District Judge.[*]

---

**LUCERO**, Circuit Judge.

---

After approximately ten years of litigation regarding an oral agreement to construct a portion of a golf course by plaintiff-appellee Homestead Golf Club, Inc. ("HGC") on property owned by defendant-appellant Pride Stables ("Pride"), allegedly in exchange for a loan, the district court decided that the parties had not created an enforceable contract and dismissed the case. Exercising jurisdiction pursuant to 28 U.S.C. §§ 158(d) and 1291, we affirm. [1]

---

[*] The Honorable Wayne E. Alley, Senior District Judge, United States District Court for the Western District of Oklahoma, sitting by designation.

[1] We requested supplemental briefing on the question of whether Pride has standing to appeal the order of the district court when it prevailed on the merits. "While it is the general rule that a party cannot appeal from a judgment in his favor, the rule is not absolute, and where a judgment gives the successful party only part of that which he seeks and denies him the balance, with the result that injustice has been done him, he may appeal from the entire judgment." See Jarvis v. Nobel/Sysco Food Servs. Co., 985 F.2d 1419, 1424 (10th Cir. 1993) (quoting Automobile Ins. Co. v. Barnes-Manley Wet Wash Laundry Co., 168 F.2d 381, 386 (10th Cir. 1948)); cf. American Ready Mix, Inc. v. Behles, 14 F.3d 1497, 1500 (10th Cir. 1994) (holding that parties are "aggrieved" by a bankruptcy court's decision "if the order . . . diminishes their property, increases their burdens, or impairs their rights" (internal quotation and citation omitted)). Because the district court's decision that no valid contract existed between the parties will collaterally estop Pride in its state court action against HGC, we conclude that Pride is entitled to appeal the judgment of the district court.

# I

HGC was organized to construct a golf course on property adjacent to the Homestead Resort in Midway, Utah. Pride owned a fifty-percent interest in the property on which the fourteenth hole of the golf course was to be built (the "fourteenth hole property"), as well as a fifty-percent interest in other property co-owned by Cal Clark on which other portions of the golf course were to be constructed (the "Clark-Pride property"). In 1987, HGC and Pride began negotiating the construction of portions of this golf course on Pride's property. By Spring 1988, however, Pride was in default on loans secured by the Clark-Pride property from Valley Bank & Trust Co. ("Valley Bank"), Davis County Bank ("DCB"), and Crossland Savings & Loan ("Crossland") and was pursuing forbearance agreements with some of these lenders to forestall foreclosure proceedings.

On May 9, 1988, Pride purportedly granted an oral license to allow HGC to construct the golf course on portions of its property in exchange for a loan of $185,000—an amount Pride needed to obtain forbearance from its secured creditors on the Clark-Pride property. Notably, the parties dispute whether the loan related only to HGC's use of the Clark-Pride property or whether it related to HGC's use of both the Clark-Pride and fourteenth hole properties.

Pending written documentation of this oral agreement, Pride and the other property owners signed a letter of commitment on June 15, 1988, permitting HGC to begin construction of the golf course on the fourteenth hole property. The letter of commitment stated:

> We . . . give this letter of commitment to the City of Midway . . . for the purpose of issuing a building permit to [HGC]. By this letter we indicate our commitment to granting to [HGC] an appropriate easement or license over the property . . . for the purpose of their developing a golf course in Midway, Utah. The underlying agreements between the parties necessary to make such a commitment have been reached in principle and are awaiting final documentation, which is expected to be prepared and signed within the next two weeks. As such, we have no objection to the granting of a construction permit to [HGC] for the purpose of beginning construction on the proposed golf course in Midway, Utah.

(II Appellant's App. at 576.) During the next month, the City of Midway granted the permit, and HGC began construction. HGC also gave Pride's General Partner, Robert Condie, a check in the amount of $5,000 payable to Condie and Crossland.

Despite the letter of commitment, the parties were unable to agree in writing on the terms of their oral agreement. In August, Pride received a proposed license agreement from HGC for the Clark-Pride property and a promissory note for $185,000. HGC prepared a separate license agreement for the fourteenth hole property. Pride did not sign either of the license agreements. In the face of threatened foreclosure, Pride requested a modification of the loan and its payment, but HGC alleges it would not agree to the modifications unless Pride

- 4 -

obtained agreements from its lenders to subordinate their loans to the license granted to HGC. Creditors would not sign the subordination agreements, and HGC refused to make the modified loans.

Seeking a declaration that it had the right to use the fourteenth hole property, HGC filed this adversary proceeding against Pride on April 28, 1989 in bankruptcy court. Pride had filed a petition under Chapter 11 of the United States Bankruptcy Code in May 1987, and a plan of reorganization had been confirmed by the bankruptcy court in March 1988. After trial on HGC's complaint, the bankruptcy court entered judgment in favor of Pride. On appeal, the district court reversed and remanded, finding insufficient evidence in the record to support the bankruptcy court's conclusion that HGC had breached the May 9, 1988 agreement in December of that year by failing to fund the proposed loan.

On remand, the bankruptcy court entered judgment for HGC, but on further appeal the district court again remanded, this time for consideration of "unresolved factual issues" that the bankruptcy court had failed to address.[2] After an evidentiary hearing, the bankruptcy court entered judgment for Pride and dismissed HGC's complaint, finding that HGC had anticipatorily repudiated the parties' loan agreement in September 1988.

---

[2] Specifically, the district court instructed the bankruptcy court to consider whether HGC had repudiated the May 9, 1988 agreement in September 1988.

On appeal for the third time, the district court affirmed the bankruptcy court's dismissal of HGC's complaint, but on alternative grounds. Without reversing the determination of the bankruptcy court that HGC had anticipatorily breached the agreement, the district court held that dismissal of HGC's complaint was required because no enforceable contract existed. Pride filed a motion to amend the judgment to alter the district court's holding that the parties did not create an enforceable contract, which the district court denied. The parties filed cross-appeals from the district court's judgment.[3]

## II

Reviewing a district court's decision in its capacity as bankruptcy appellate court, we apply the clear error standard to a bankruptcy court's findings of fact and the de novo standard to its conclusions of law. See Phillips v. White (In re White), 25 F.3d 931, 933 (10th Cir. 1994). "A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made." Conoco, Inc. v. Styler (In re Peterson Distrib., Inc.), 82 F.3d 956, 959 (10th Cir. 1996). "It is especially important to be faithful to the clearly erroneous standard when the bankruptcy court's findings have been upheld by the district

---

[3] HGC has also filed a Motion for Leave to File Supplemental Appendix to Reply Brief, which we grant.

court." Osborn v. Durant Bank & Trust Co., 24 F.3d 1199, 1203 (10th Cir. 1994).

Under Utah law, the existence of a valid, enforceable contract is a question of law

which we review for "correctness." John Deere Co. v. A & H Equip., Inc., 876

P.2d 880, 883 (Utah 1994); see also Herm Hughes & Sons, Inc. v. Quintek, 834

P.2d 582, 583 (Utah Ct. App. 1992).[4]  "The burden of proving the existence of a

contract is on the party seeking enforcement of it."  Oberhansly v. Earle, 572 P.2d

1384, 1386 (Utah 1977) (citing B & R Supply Co v. Bringhurst, 503 P.2d 1216,

1217 (Utah 1972)).

## A

The parties dispute whether their oral agreement of May 9, 1988 is an

enforceable contract.  "A condition precedent to the enforcement of any contract

is that there be a meeting of the minds of the parties, which must be spelled out,

either expressly or impliedly, with sufficient definiteness to be enforced."[5]

Valcarce v. Bitters, 362 P.2d 427, 428 (Utah 1961).  "[C]ontractual mutual assent

requires assent by all parties to the same thing in the same sense so that their

---

[4]  Contrary to Pride's assertions, the district court did not violate the clear error standard for review of the bankruptcy court's factual findings by holding that the May 9, 1988 agreement is unenforceable because, as noted, whether an enforceable contract exists is a question of law.

[5]  Because a condition precedent to the enforcement of an agreement is a finding of fact that there was a meeting of the minds sufficient to form an enforceable contract, the district court's holding that no enforceable contract existed is not, as Pride contends, surplusage to its decision.

minds meet as to all the terms." Cessna Fin. Corp. v. Meyer, 575 P.2d 1048, 1050 (Utah 1978); see also Sackler v. Savin, 897 P.2d 1217, 1220-22 (Utah 1995) (holding that to form an enforceable contract, there must be a meeting of the minds on the essential terms of the agreement).

Normally, the intentions of the parties "will be found from the instrument itself," but where, as here, the parties did not execute a written contract, "resort may be had to extraneous evidence manifesting the intentions of the parties." Oberhansly, 572 P.2d at 1386. The focus of our inquiry is the oral discussion on May 9, 1988, during which Pride purportedly granted a license to allow HGC to construct the golf course on portions of Pride's property in exchange for a $185,000 loan.

Based on its examination of the evidence of the oral agreement, the district court concluded that "[i]mportant material terms such as the funding date, interest rate, and payment schedule . . . were not determined at that time." (I Appellant's App. at 293.) Not only were important terms left open, but it is not even clear which property lease supported the proposed loan. HGC claims the loan related only to the Clark-Pride property, but Pride alleges the loan was supported by HGC's use of both the Clark-Pride and the fourteenth hole properties. If "there was simply some nebulous notion in the air that a contract might be entered into in the future, the court cannot fabricate the kind of a contract the parties ought to

have made and enforce it." Valcarce, 362 P.2d at 428-29 (citation omitted). We conclude this is the situation present here.

Because the parties did not ultimately memorialize their oral agreement, we must inquire beyond the verbal discussions into the attempts at written documentation. The aforementioned letter of commitment regarding the fourteenth hole property was signed by Pride and stated in relevant part:

> By this letter we indicate our commitment to granting to [HGC] an appropriate easement or license over the property . . . . The underlying agreements between the parties necessary to make such a commitment have been reached in principle and are awaiting final documentation, which is expected to be prepared and signed within the next two weeks. As such, we have no objection to the granting of a construction permit . . . .

(II Appellant's App. at 576.) In addition, as detailed above, HGC prepared and sent to Pride a license agreement and a promissory note in the amount of $185,000 for the Clark-Pride property and prepared a separate license agreement for the fourteenth hole property. As we have noted, Pride did not sign either of the license agreements. The license agreements and the promissory note are of limited value in determining the parties' intent because they were never signed or executed. Moreover, the letter of commitment did not specify the terms of the oral agreement and stated explicitly the parties' intent to document the details of their arrangement in writing at a later time.

Conceding that no formal agreements "were ever signed by the parties," Pride nevertheless asserts that the missing material terms of the parties' agreement were actually contained in the record on appeal. (Appellant's Br. at 18.) Condie, who was negotiating on behalf of Pride, testified that the terms of the loan, including the interest rate, the payback of the loan, and the purported use of the funds to gain forbearance from foreclosure, were discussed on May 9, 1988, as well as the "dedication or use of [Pride's] property for the golf course" as a "condition of that loan." (II Appellant's App. at 382-85.) But this argument did not make it onto the green because Condie also testified that the "next step . . . after that meeting" was that "[t]he documents would be prepared to put into writing the understanding." (Id. at 387.)

If the parties intend to negotiate further the terms of an agreement, a manifestation of willingness to enter into the agreement is only preliminary, and does not demonstrate the existence of a binding contract. See Sackler, 897 P.2d at 1221-22. For example, in Crimson v. Western Co. of North America, 742 P.2d 1219, 1222 (Utah Ct. App. 1987), a letter indicated that "the parties were still negotiating . . . [, defendant's] legal department would be sending a prepared lease[, and] . . . both parties understood that a binding contract would be entered into in the future." The parties then exchanged proposed leases, which the Utah Court of Appeals held "clearly demonstrates that they did not have a meeting of

- 10 -

the minds as to all of the essential terms of the lease." Id. at 1222. In the instant case, the letter of commitment evidences that same intention—to prepare written documentation of the parties' understanding which would then constitute the binding contract. That intention was precisely what the bankruptcy court found: "The parties intended that their agreement be reduced to writing and executed." (I Appellant's App. at 273.) HGC drafted this documentation, but Pride did not sign it. All that the parties consummated on May 9, 1988 was an agreement to agree, which is "unenforceable because [it] leave[s] open material terms for future consideration, and the courts cannot create these terms for the parties." Harmon v. Greenwood, 596 P.2d 636, 639 (Utah 1979) (citing 17 Am. Jur. 2d 362 Contracts § 26 (1991)) (further citations omitted)).

Notwithstanding uncertainty regarding the terms of the loan, Pride argues that the terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy. See Restatement (Second) of Contracts § 33(2) (1979). But this argument lands Pride in a bunker: Like the district court, we are at a loss to determine what that remedy would be, because we are unable to determine the rights of the respective parties under the agreement.[6] As explained by the district court, "[t]he record

---

[6] Pre-trial orders measure the dimensions of the lawsuit, both in the trial court and on appeal. See American Home Assurance Co. v. Cessna Aircraft Co.,

(continued...)

does not indicate which party was to perform first . . . [or] what the required performance was: Did the agreement call for Pride to sign the promissory note and obtain licenses before the loan would be funded, as HGC suggests, or was HGC to fund the loan first before obtaining either the licenses or subordinations?" (I Appellant's App. at 292.) Furthermore, the complaint at issue sought a declaration of rights pertaining to the fourteenth hole property, but the parties dispute whether the oral loan agreement related to that property or, as HGC contends, related only to the Clark-Pride property.[7] We will not speculate as to the parties' intentions regarding a lease or easement for the fourteenth hole property. Where, as here, we cannot determine what the rights of the parties

---

[6] (...continued)
551 F.2d 804, 806 (10th Cir. 1977). Pride asserts for the first time in its reply brief that we are bound by the parties' stipulation in the pre-trial order that "[o]n or about May 9, 1988 [HGC] and [Pride] orally agreed that [HGC] would lend [Pride] the sum of $185,000 so that [Pride] could make payment to certain of its creditors." (I Appellant's App. at 183-84.) The district court's holding that the oral agreement is not sufficiently definite to form a contract is not contrary to this stipulation.

[7] Because the scope of the complaint and subsequent findings of the bankruptcy court are limited to the fourteenth hole property, we do not address whether the parties entered into an agreement or contract relative to the Clark-Pride property. Our decision therefore does not preclude any pending or future actions involving claims relevant only to the Clark-Pride property.

would be under an agreement, we cannot enforce that agreement.[8]  <u>See</u>

<u>Oberhansly</u>, 572 P.2d at 1387.

---

[8]  Pride claims that it is entitled to a finding of an enforceable contract pursuant to Fed. R. Civ. P. 54(c), which states in relevant part that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled."  This claim is without merit because the district court has the authority to affirm the bankruptcy court's decision on an alternative ground supported by the record.  <u>See</u> <u>Sampson v. Sampson (In re Sampson)</u>, 997 F.2d 717, 721 (10th Cir. 1993).  Likewise, Pride's reliance in its reply brief on <u>Brown v. Gurney</u>, 201 U.S. 184, 190 (1906), is misplaced.  The Supreme Court in <u>Brown</u> held that "where the existence of certain facts is assumed in the trial court and the trial proceeds, without objection, on that assumption, and the case is decided in reliance thereon, neither party will be heard in the court of review to question . . . the existence of the facts."  However, the instant case is distinguishable because whether the agreement constitutes an enforceable contract is a question of law, not of fact.

**B**

Pride would have us ignore the missing elements in its documentation that make the contract unenforceable by arguing that it fully performed in allowing HGC to construct its golf course, but that HGC refused to fund the loan knowing that failure to do so could result in foreclosure on Pride's property. According to Pride, allowing HGC to retain the benefit of the bargain, while denying Pride the opportunity to recover the damages it incurred due to HGC's breach of the agreement on the grounds of indefiniteness, would be inequitable.[9]

Pride tees its argument on 17 Am. Jur. 2d Contracts § 193 (1991):

The determination that an agreement is sufficiently definite is favored. Rejection of a contract for indefiniteness is, at best, a last resort. Therefore, courts will, if possible, so construe the agreement as to carry into effect the reasonable intention of the parties, if that can be ascertained. In other words, in interpreting doubtful agreements a court will, if possible, attach a sufficiently definite meaning to a bargain of parties who evidently intended to enter into a binding contract. The law leans against the destruction of contracts for uncertainty, particularly where one of the parties has performed part of the contract.

---

[9] We do not address the merits of Pride's reply brief contention that it is entitled to relief pursuant to the doctrines enunciated in Restatement (Second) of Contracts §§ 34 and 69(2) (1979). See Lyons v. Jefferson Bank & Trust, 994 F.2d 716, 724 (10th Cir. 1993) (holding that issues raised for the first time in the reply brief will not be considered). Ordinarily, detrimental reliance might allow a remedy where no formal contract exists, or, alternatively, partial performance such as occurred here might support a finding of an enforceable contract. See Restatement (Second) of Contracts § 34 (1979). Pride, however, did not advance arguments based on these theories until its reply brief, although it did place in play the doctrinally independent concept of equitable estoppel.

Pride contends that even if the oral agreement in its original conception was unenforceable, the fact that HGC acted on this agreement by constructing the golf course, in addition to fronting Pride Stables $5,000 of the agreed-on $185,000 loan, constitutes an acceptance of the bargain.[10]

It is true that HGC began construction of the course in June 1988 and gave Condie a check in the amount of $5,000 payable to Condie and Crossland the following month. It is also true that "conduct by one party which leads another party, in reliance thereon, to adopt a course of action resulting in detriment or damage if the first party is permitted to repudiate his conduct" may constitute equitable estoppel. Blackhurst v. Transamerica Ins. Co., 699 P.2d 688, 691 (Utah 1985). But Pride fails to drive the point home, because "a mere promise to execute a written contract and a subsequent refusal to do so is insufficient to create an estoppel, although reliance is placed on such a promise and damage is sustained as a consequence of the refusal." F.C. Stangl, III v. Ernst Home Ctr., Inc., 948 P.2d 356, 365 (Utah Ct. App. 1997) (quoting McKinnon v. The Corp. of

---

[10] As an alternative basis for finding injury, Pride argues that Lem Stroud, who negotiated on behalf of HGC, admitted that he had a fiduciary duty and made representations to Pride that if it would contribute its property, it would be "morally, legally and otherwise protected in their dealings." (Appellant's Br. at 17 (citing Appellant's App. at 333-34).) We do not consider this argument because Pride has utterly failed to support it with legal authority. See Phillips v. Calhoun, 956 F.2d 949, 953-54 (10th Cir. 1992) (holding that a party must support its argument with legal authority).

the President of the Church of Jesus Christ of Latter-Day Saints, 529 P.2d 434, 436-37 (Utah 1974)).  Pride merely relied on HGC's promise to execute a written contract, which is insufficient to create an estoppel.

C

In its conclusion, the district court stated:  "It appears that the loan agreement, as contemplated by the parties, more closely resembled a Monet—an impressionist rendering fashioned as the thoughts occurred to them—rather than a Manet of detailed execution."  (I Appellant's App. Doc. 19 at 11 (citing United States v. Cropper, 42 F.3d 755, 759 (2d Cir. 1994).)  But it is the surreal nature of the parties' conduct that we find remarkable.  As noted by the district court, "[w]hy any business would begin developing a golf course on land it had no ownership interest in, without first securing written permission to use the land on terms that required a definite performance and secured that interest, is beyond the comprehension of this Court."  (I Appellant's App. Doc. 19 at 8.)  We fault the district court only in its choice of artistic metaphor—Impressionism rather than Surrealism—but otherwise take its view of the matter.

VIII

The judgment of the district court is **AFFIRMED**.