Tani SACKLER, Plaintiff and Appellant,

v.

Robert SAVIN, Defendant and Appellee.

No. 940258.

Supreme Court of Utah.

June 16, 1995.

Blake S. Atkin, Jonathan Hawkins, Salt Lake City, for plaintiff.

Gordon Strachan, Todd D. Wakefield, Park City, for defendant.

DURHAM, Justice:

We granted an interlocutory appeal from a Third District Court order denying plaintiff Tani Sackler's motion to enforce a settlement agreement reached between Sackler and defendant Robert Savin. We affirm.

This case arises out of a 1986 oral partnership agreement entered into by Sackler and Savin for the purpose of acquiring a condominium unit in Deer Valley, which they planned to rent to skiers for profit. The parties contributed equal sums to the investment and agreed to divide the return equally.

In 1993, Savin began personally occupying the unit on occasion, and a dispute arose over how much Savin should pay for his personal use. On June 17, 1993, Sackler wrote Savin, demanding that he pay her one-half of the estimated owner usage value. On August 19, 1993, in a letter from Savin's counsel, Savin presented Sackler with a proposal. Savin's proposal expressly stated that "should the general terms of this letter be acceptable," then the parties could "proceed to a formal agreement." Savin's proposal provided in pertinent part:

> [Savin] is fully prepared to pay for his personal use of the unit. That compensation to [Sackler] would be based on the following basic criteria:
>
> 1. [Savin] would be charged the "rack rate" [1] applicable to each period during which [Savin] personally occupied the unit. [Savin] would be given a 10% discount from the applicable "rack rate". That discount represents the standard discount that would be given to a travel agency for having placed guests in the unit.
>
> 2. For any periods in which the unit was not otherwise booked for guest use, but was used by [Savin] (due to lack of seasonal use, etc.) [Savin] would pay the rate of $50.00 per night for use of the suite; and $25.00 per night for use of an individual bedroom, as is customary for unit owners.

The letter also included a proposal regarding the sale of the unit.

Sackler's counsel responded to Savin's proposal with an October 18, 1993, letter which provided in part:

> Now, with respect to settlement, my client accepts your proposal that [Savin] be charged the "rack rate" less 10 percent for any personal use of the unit. That amount will be deducted from [Savin's] 50 percent rental income and [Sackler's] rental income shall be increased by that amount.

The letter also proposed additional terms regarding the sale of the unit and the handling of partnership checks and then stated,

1. "Rack rate" means full rental rate.

"Please review our counter proposals with your client and, if he finds them acceptable, please call me so that I can prepare an agreement."

The next correspondence is a letter dated November 24, 1993, from Sackler's counsel to Savin's counsel, which memorializes a conversation between counsel for the parties:

> When we last spoke on November 3, 1993 . . . we had agreed to resolve this matter on the basis set forth in my last letter to you with the exception that we were unable to agree on a purchase price net to the owners. . . .

Sackler's counsel then sent two letters to Savin's counsel, dated December 10, 1993, and January 13, 1994, calculating the amounts Savin allegedly owed Sackler under Sackler's understanding of the parties' alleged agreement. In both letters, the calculations showed the ninety percent rack rate being paid directly to Sackler, not to the partnership.

Savin's counsel responded with a letter of January 18, 1994, expressing surprise that the accounting questions were not separated from the sale of the condominium. The letter further stated, "Even if your client were to prevail on all her claims totalling $14,360," as set out in Sackler's letter of January 13, "that is only 2.2% of the sale price. . . . Should this potential purchase for immediate all cash sale of $635,000 be lost because of your client's bad faith refusal to separate, escrow, or resolve independently the modest accounting question as her fiduciary duties require, my client's counterclaim will seek substantial damages."

The next written correspondence is a letter of January 20, 1994, in which Savin's counsel states that Savin is still willing to reimburse Sackler "according to the formula agreed upon by the parties back in October—90% of the rack rate." The letter further stated, "At this time, we neither agree nor disagree with the dollar figure set forth in your letter of January 13, 1994 because we have not yet

been able to confirm the dates of usage of the unit."

In a letter of January 27, 1994, Savin's counsel wrote Sackler's counsel that if Sackler would allow the sale of the condominium, "Savin [would] pay from his portion of the proceeds all of the $14,360.00 amount demanded in [the] letter of January 13, 1994 for his personal use of the condominium." In a letter of January 31, 1994, Savin's counsel again wrote Sackler's counsel that if Sackler would cooperate in the sale of the unit to the procured buyer, Savin would pay Sackler $17,915 in full settlement for Savin's use of the unit.

Sackler's counsel responded with a February 4, 1994, letter demanding $39,920 for Savin's use of the unit. The computations laid out in the letter made clear that Sackler intended the ninety percent rack rate be paid directly to her, not to the partnership. Savin's counsel responded in a letter of February 4, 1994,[2] that the parties were operating under a misunderstanding:

> Until today, our clients had agreed that "[Savin] be charged the 'rack rate' less 10 percent for any personal use of the unit." *See* Your letter of October 18, 1993. My client had agreed to this approach because it would have placed your client in the same position she would have been in had the unit been rented to a regular paying guest (i.e., she would have received her half of the rack rate minus the 10 per cent which a travel agent would have taken off the top, or approximately $17,000).
>
> Today you expressed for the first time that Ms. Sackler's intention since the outset has been that she receive the full 90% of the rack rate. Under such a proposal, Ms. Sackler would receive twice the amount to which she would have been entitled if the room had been rented to a regular paying guest—a windfall to Ms. Sackler at Mr. Savin's expense of almost $20,000 according to your calculations. Your client's position is unreasonable, un-

---

**2.** In their briefs, the parties refer to this letter as the letter of February 8, 1994. However, this letter was merely received on February 8, 1994. It is dated January 29, 1994, on page one and

February 4, 1994, on page two. Because the letter references Sackler's letter of February 4, 1994, as "today," we refer to this letter as the letter of February 4, 1994.

fair and unacceptable and we, therefore, reject her proposal.

Despite Mr. Savin's repeated efforts to compromise and offer reasonable solutions, Ms. Sackler continues to deal in apparent bad faith. It is clear from our conversation this afternoon ... that further efforts to negotiate with Ms. Sackler would be futile. Therefore, all previous offers of settlement and compromise to Ms. Sackler are hereby revoked.

In response to this letter, Sackler's counsel wrote Savin's counsel in a letter of February 8, 1994, claiming that Savin was "reneging" on his proposal. The February 8 letter claims that "the correspondence has always contemplated that Ms. Sackler would receive the full 90 percent of the rack rate for the inappropriate personal use of the unit by Mr. Savin." The letter further states that the proposal to pay ninety percent of the rack rate to Sackler seemed reasonable and fair because paying ninety percent of the rack rate to the partnership would not put Ms. Sackler in the position she would have been had Savin not inappropriately used the unit. The letter alleges that if Savin had not been using the unit, the full rack rate would have been collected. Moreover, Savin's use of the unit allegedly "took it off the market, therefore causing consequential losses unrelated to his own personal use of the unit." This letter concluded the parties' correspondence regarding a settlement agreement.

In January 1994, during the course of the parties' correspondence, Sackler brought an action against Savin, alleging breach of contract, forgery and conversion,[3] injunctive relief, and an accounting. In April 1994, Sackler moved to enforce the settlement agreement. Judge Young ruled that no settlement agreement had been reached and therefore denied the motion. Sackler appeals.

■ We first state the proper standard of review. "Questions of contract interpretation not requiring resort to extrinsic evidence are matters of law, and on such questions we accord the trial court's interpretation no presumption of correctness." *Zions First Nat'l*

*Bank, N.A. v. National Am. Title Ins. Co.,* 749 P.2d 651, 653 (Utah 1988). In refusing to enforce the settlement agreement, the trial court based its decision solely on the documents constituting the correspondence between the parties. Because the trial court took no extrinsic evidence, we review for correctness.

■ Settlement agreements are favored by law and may be summarily enforced if there is a binding settlement agreement and the excuse for nonperformance is comparatively insubstantial. *Zions First Nat'l Bank v. Barbara Jensen Interiors, Inc.,* 781 P.2d 478, 479 (Utah Ct.App.1989). Settlement agreements are governed by the rules applied to general contract actions. *Butcher v. Gilroy,* 744 P.2d 311, 312 (Utah Ct.App.1987). Under the principles of basic contract law, a contract is not formed unless there is a meeting of the minds. *Pingree v. Continental Group of Utah, Inc.,* 558 P.2d 1317, 1321 (Utah 1976).

■ Sackler contends that the correspondence between the parties shows a meeting of the minds that created a binding settlement agreement. Sackler directs us to statements in the correspondence between the parties that might indicate a meeting of the minds. In particular, Sackler points out Savin's proposal in the August 19 letter to pay her ninety percent of the rack rate for his personal use of the property, as well as her response accepting his proposal. Sackler's response stated that the compensation would be deducted from Savin's rental income and added to Sackler's rental income. Sackler asserts that the parties clearly understood and agreed that Savin would make the ninety percent rack rate payments directly to Sackler, not to the partnership.

Savin, on the other hand, claims that the trial court was correct in finding that "no settlement agreement was reached." Savin claims that at no point during the negotiations did the parties reach a meeting of the minds. Although both parties agreed on the ninety percent rack rate formula, there was a

**3.** Sackler alleges in her complaint that Savin forged her name on several joint income payment checks.

dispute as to who would be compensated: the partnership or Sackler alone. Savin alleges it was his understanding that he would compensate the partnership, meaning that both Sackler and he would receive half of the compensation. According to Savin, he never intended to compensate Sackler directly, in which case she would retain the full payment.

Savin also claims there was a dispute as to the precise amount he would pay Sackler. In response, Sackler argues that although the parties never agreed on an exact figure, they agreed on an exact formula with which specific dollar figures could be calculated at some later point.

An examination of the correspondence between the parties leads us to agree with the trial court's conclusion that a settlement agreement was never reached. Savin's August 19 letter indicates that even if Sackler found the terms of Savin's proposal acceptable, Savin contemplated that the parties would not enter an agreement until sometime in the future. Savin's proposal clearly provided that if the terms of the letter were acceptable, then the parties could "proceed to a formal agreement." Although Sackler refers to Savin's proposal as an "offer," the characterization is not determinative.

The Restatement of Contracts on preliminary negotiations states:

A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.

Restatement (Second) of Contracts § 26 (1981); see also DeBry & Hilton Travel Servs., Inc. v. Capitol Int'l Airways, 583 P.2d 1181, 1186 (Utah 1978) (quoting favorably a prior version of section 26). Sackler's response to Savin's August 19 proposal further indicates that both parties understood a binding contract would not be entered until some point in the future. Sackler's October 18 letter stated that if Savin found the counter-proposals acceptable, to please call "so that I can prepare an agreement." These letters indicate that both parties understood they

had not yet formed a binding settlement agreement.

The Restatement of Contracts on the existence of a contract where a written memorial is contemplated provides:

Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; *but the circumstances may show that the agreements are preliminary negotiations.*

Restatement (Second) of Contracts § 27 (1981) (emphasis added); see also DeBry, 583 P.2d at 1186. Comment c to section 27 states:

Among the circumstances which may be helpful in determining whether a contract has been concluded are the following: the extent to which express agreement has been reached on all the terms to be included, whether the contract is of a type usually put in writing, whether it needs a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, whether a standard form of contract is widely used in similar transactions, and whether either party takes any action in preparation for performance during the negotiations. Such circumstances may be shown by oral testimony or by correspondence or other preliminary or partially complete writings.

Restatement (Second) of Contracts § 27 cmt. c (1981). The correspondence between the parties demonstrates that the parties were still in preliminary negotiations.

Most notably, the parties had not come to an agreement on the essential terms of the contract. First, there was an apparent misunderstanding as to the substance of the agreement, i.e., the so-called "rack rate formula." Sackler's letter of June 17 demanded that Savin pay her one-half of the estimated owner usage value. Consistent with Sackler's demand, Savin proposed that he be charged ninety percent of the rack rate, apparently understanding that he would be compensating the partnership, not Sackler

directly. Under Savin's alleged understanding, Sackler would receive one-half of ninety percent of the rack rate, a proposal entirely consistent with Sackler's June 17 demand. Subsequent to this correspondence, Sackler began setting out a different formula. Her October 18 letter stated that the ninety percent rack rate would be deducted from Savin's rental income and added to her rental income. Her calculations in the letters of December 10 and January 13 further demonstrate this new formula. Because neither party pointed out this radical change in "understanding," we find it difficult to conclude that there was any such understanding. Sackler has failed to convince us that there was a meeting of the minds as to the general formula the parties would use in a settlement agreement.[4]

■ The parties' correspondence demonstrates that they did not reach a meeting of the minds as to the essential terms of a settlement agreement. Sackler as the plaintiff has the burden of showing that an offer and acceptance were more probable than not. See *R.J. Daum Constr. Co. v. Child*, 122 Utah 194, 247 P.2d 817, 821 (1952). Sackler has failed to convince us that the parties proceeded beyond preliminary negotiations for a settlement agreement.

Accordingly, we affirm the trial court's denial of Sackler's motion for summary enforcement. The case is remanded for trial.

ZIMMERMAN, C.J., STEWART, Associate C.J., and HOWE and RUSSON, JJ., concur.

---

4. Sackler also argues that Savin's verified pleadings demonstrate that he agreed to pay her directly. We find this argument without merit. In his answer and verified counterclaim, Savin merely reiterates what Sackler agreed to in her letters. Such a recitation of Sackler's communications is in no way an admission that Savin agreed to these terms.

