69 F.3d 548
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Robert SUTTON and Catherine Sutton, as individuals and as
administrators of the Estate of Michelle Sutton,
Plaintiffs-Appellants,
v.
Ruth YOUNG, Lance Ferwerda, Canyonlands Human Services, Defendants,
and
Ronald A. LARSEN, M.D., Steven Van Norman, M.D., Robert
O'brien, individually, and doing business as Dixie
Medical Center,
Defendants-Cross-Claimants-Appellees,
v.
SUMMIT QUEST, INC., a Utah corporation; Gayle D. Palmer and
Sandra Noxon, individually and doing business as
Summit Quest, Inc.,
Defendants-Crossclaim-Defendants.
 No. 94-4207.
 United States Court of Appeals, Tenth Circuit.
 Nov. 2, 1995.
 
 ORDER AND JUDGMENT[1]
 Before KELLY, SETH, and HENRY, Circuit Judges.
 
 
 1
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R.App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.
 
 
 2
 Plaintiffs Robert and Catherine Sutton, individually and on behalf of their daughter's estate, appeal the district court's grant of summary judgment in favor of defendant physicians on the Suttons' malpractice and negligence claims. Because there is no genuine issue of material fact whether the physicians had a duty to protect decedent, we affirm.
 
 
 3
 In April 1990, organizers put together a wilderness residential treatment program called Summit Quest, Inc. On April 23, 1990, the organizers contacted physician Ronald Larsen to inquire whether he and his associates would be interested in supervising the medical aspects of the program. Dr. Larsen met briefly with Summit Quest representative Gerald Farr to discuss the possibility that he and his associates, Dr. Steven Van Norman and Dr. Robert O'Brien, would perform intake examinations and emergency medical care for Summit Quest.
 
 
 4
 At the meeting, Dr. Larsen identified certain medical information he needed about the program's activities, food, and medical protocols. Mr. Farr told Dr. Larsen that the program would not begin until summer, and that the additional information would be provided at a future meeting. Mr. Farr also indicated that the field counselors would carry short-wave radios, and that two of the counselors were emergency medical technicians.
 
 
 5
 Several days later, Summit Quest asked Dr. Larsen to write a letter stating that he and his associates would be providing medical services for the program. Dr. Larsen was given the impression that the letter was needed for either licensing or insurance purposes. On April 27, 1990, Dr. Larsen wrote the following letter and sent it via facsimile to Summit Quest:
 
 
 6
 To Whom It May Concern,
 
 
 7
 I, Ronald A. Larsen, M.D., and my associates Steven VanNorman, M.D. and Robert O'Brien, M.D., are affiliated with Summit Quest, Inc. and will be acting as their consulting physicians. We will supervise all medical care for their participants including physical exams and emergencies. We are on staff at Dixie Medical Center, St. George, Utah, and have full nursing staff and diagnostic facilities available to us.
 
 
 8
 (signed)
 
 
 9
 Ronald A. Larsen, M.D.
 
 
 10
 Appellant's App., Vol. I at 51. When the letter was written, Dr. O'Brien had not yet been informed about the proposed relationship with Summit Quest.
 
 
 11
 Without the doctors' knowledge, Summit Quest began operating its program on May 1, 1990. On May 9, 1990, fifteen-year-old Michelle Sutton died of dehydration, heat stroke, and exposure while participating in the program. Upon hearing that Summit Quest had placed participants in the field without physical examinations and before medical guidelines were established, the doctors attempted to sever their relationship with Summit Quest.
 
 
 12
 Michelle's parents brought this action against several defendants, including physicians Larsen, Van Norman, and O'Brien. The claims against the doctors sounded in tort, primarily medical malpractice and negligence, based on the doctors' failure to devise appropriate medical standards for Summit Quest, their failure to protect Michelle from the risks of the Summit Quest program, their failure to treat Michelle's condition competently, and their representation that they supervised the program. The district court granted summary judgment in favor of Dr. O'Brien because he had no knowledge of Summit Quest or the proposed agreement when Michelle died, and thus did not have a duty of care toward her. Summary judgment was granted in favor of Drs. Larsen and Van Norman on the ground that they did not have a doctor-patient or contractual relationship that would support a duty of care toward Michelle.
 
 
 13
 Because this case was premised on diversity jurisdiction, we apply the substantive law of the forum state, including its choice of law provisions. See Perlmutter v. United States Gypsum Co., 54 F.3d 659, 662 (10th Cir.1995); Rocky Mountain Helicopters, Inc. v. Bell Helicopter Textron, Inc., 24 F.3d 125, 128 (10th Cir.1994). Applying Utah's "most significant relationship" analysis to determine the choice of law in the causes of action in this case, we find that the circumstances dictate that Utah law governs all of the Suttons' claims against the doctors. Rocky Mountain Helicopters, 24 F.3d at 128-29.
 
 
 14
 We review the grant of summary judgment using federal standards, however, applying the same standards as those used by the district court. Id. Summary judgment is appropriate when "the pleadings [and] depositions ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We view the record in the light most favorable to the party opposing the motion. Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir.1991).
 
 
 15
 To prove either medical malpractice or negligence, the Suttons were required to show that the doctors owed Michelle a duty of care. Robinson v. Intermountain Health Care, Inc., 740 P.2d 262, 264 (Utah Ct.App.1987). "In cases where the alleged negligence consists of a failure to act, the person injured by another's inaction must demonstrate the existence of some special relationship between the parties creating a duty on the part of the latter to exercise such due care in behalf of the former." DCR Inc. v. Peak Alarm Co., 663 P.2d 433, 435 (Utah 1983). In medical malpractice cases, a duty of care may be shown by demonstrating the existence of a doctor-patient relationship between the parties. In ordinary negligence cases, the special relationship may arise, inter alia, from contractual relationships for the performance of services. Id.
 
 
 16
 A doctor-patient relationship is established by evidence that a physician has undertaken treatment of a patient, or has agreed to accept a particular person as a patient. See James L. Rigelhaupt, Jr., Annotation, What Constitutes Physician-Patient Relationship for Malpractice Purposes, 17 A.L.R.4th 132 (1982). Here, it is undisputed that when Michelle died, Dr. O'Brien had never heard of her or of Summit Quest, and did not know of the proposed agreement to provide medical care for the program. He therefore had no treatment or contractual relationship with Michelle, and had no duty to protect her.
 
 
 17
 Drs. Larsen and Van Norman also never heard of, saw, examined, or rendered medical care to Michelle before her death, and thus did not form a doctor-patient relationship with her through treatment. See, e.g., Wilcox v. Salt Lake City Corp., 484 P.2d 1200, 1201 (Utah 1971). There is also no basis under these circumstances that there could have been a negligent misrepresentation.
 
 
 18
 Moreover, the doctors' alleged contract with Summit Quest did not establish a doctor-patient relationship or a duty of care in May 1990. To form an enforceable contract, there must be a meeting of the minds on the essential terms of the agreement. See Sackler v. Savin, 897 P.2d 1217, 1220-22 (Utah 1995); C & Y Corp. v. General Biometrics, Inc., 896 P.2d 47, 52-53 (Utah Ct.App.1995). If the parties intend to negotiate further the terms of an agreement, a manifestation of willingness to enter into the agreement is preliminary only, and does not demonstrate the existence of a binding contract. Sackler, 897 P.2d at 1221-22.
 
 
 19
 Here, there is no evidence that the physicians and Summit Quest reached a final agreement regarding the services to be rendered, the compensation to be paid, or the length of the contract. Instead, it is undisputed that they intended to negotiate further the details of their relationship. The affiliation agreement was preliminary in nature, therefore, and did not create a doctor-patient relationship or a duty of care.
 
 
 20
 Even if Dr. Larsen's letter could be construed as evidence of a binding contract, no duty of care would have arisen in May 1990, based on Summit Quest's representation that its program was to begin in the summer of 1990. As the undisputed evidence shows that the physicians did not have a doctor-patient relationship with Michelle in May 1990, summary judgment was appropriate on the malpractice claims. The lack of a doctor-patient relationship negates the Suttons' informed consent claims as well. See Utah Code Ann. 78-14-5(1)(a).
 
 
 21
 The Suttons argue that because the physicians sought dismissal of their first complaint for failure to comply with the medical malpractice statute, they are now estopped from denying the existence of a doctor-patient relationship. The Suttons reason that compliance with the statute is required only when the claims arise out of a doctor-patient relationship, and that the court's dismissal of the first complaint encompassed a finding that such a relationship existed. This argument is without merit. The first complaint alleged that the physicians negligently failed to establish medical standards or supervise Michelle's care. These were malpractice claims, requiring compliance with the statute, whether or not the Suttons could later prove the necessary doctor-patient relationship. See id. 78-14-3(12).
 
 
 22
 Finally, summary judgment was proper on the negligent misrepresentation claim, as it is undisputed that the Suttons did not know about Dr. Larsen's note before sending Michelle to Summit Quest, and therefore did not rely on it. See Loosle v. First Fed. Sav. & Loan Ass'n, 858 P.2d 999, 1001 (Utah 1993) (affirming summary judgment on negligent misrepresentation claim when plaintiffs were unaware of allegedly false appraisal before purchasing property, and thus could not have relied on it).
 
 
 23
 The judgment of the United States District Court for the District of Utah is AFFIRMED.
 
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470