**2016 UT App 110**

# THE UTAH COURT OF APPEALS

BRIAN LEBRECHT AND ELIZABETH LEBRECHT,
Appellees,
*v.*
DEEP BLUE POOLS AND SPAS INC.
AND ANTHONY FINDLEY,
Appellants.

Opinion
No. 20140536-CA
Filed May 26, 2016

Third District Court, Salt Lake Department
The Honorable Paul B. Parker
No. 130900973

Marcus R. Mumford, Joshua S. Ostler, and Michelle
Q. Mumford, Attorneys for Appellants

Edwin C. Barnes and Robert D. Andreasen,
Attorneys for Appellees

JUDGE KATE A. TOOMEY authored this Opinion, in which JUDGE
STEPHEN L. ROTH and SENIOR JUDGE RUSSELL W. BENCH
concurred.[1]

TOOMEY, Judge:

¶1     This case involves a dispute between property owners
and the contractor they hired to install a pool and other outdoor
features in their backyard. There are two main issues on appeal.
First, we must decide whether the trial court correctly
determined that the parties entered into an enforceable
settlement agreement. And second, we must determine whether

---

1. Senior Judge Russell W. Bench sat by special assignment as
authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

the court erred when it declined to sanction the plaintiffs and their lawyer for dishonesty. We affirm the court's decision not to impose sanctions but reverse its ruling that the parties' negotiations were an enforceable settlement agreement.

BACKGROUND

¶2     In February 2013, Brian and Elizabeth Lebrecht filed a lawsuit against Deep Blue Pools and Spas Inc. and its owner, Anthony Findley (collectively, Deep Blue Pools). Their complaint alleged that Deep Blue Pools failed to construct their swimming pool, built-in barbeque pit, concrete decking, and waterfall in a "workmanlike" manner. Deep Blue Pools answered the Lebrechts' complaint and filed a counterclaim, alleging the Lebrechts did not fully pay for the work performed on their property.

¶3     After nearly a year of litigation, including discovery, the parties met twice to negotiate a settlement. Although Mr. Lebrecht himself is a transactional attorney, neither party had attorneys present during these meetings. During the second meeting, Mr. Lebrecht and Mr. Findley each initialed or signed a handwritten paper,[2] dated February 18, 2014, which included information material to the parties' purported settlement (the Term Sheet). The terms began with the number $125,000 crossed out and the number $112,500 written above it. Next, among other terms, the Term Sheet stated, "$20,000 on signing settlement," "payable . . . $56,250 in 6 mo.," and "remaining . . . balance due in 12 mo[.], earn 10% interest beginning in 6 mo." It also indicated that the parties were negotiating for mutual confidentiality agreements and would tell the Utah Division of Occupational and Professional Licensing that they had "settled

---

2. Mr. Lebrecht initialed or signed on behalf of both Lebrechts. Mr. Findley signed on behalf of Deep Blue Pools.

amicably." Finally, the Term Sheet indicated that Deep Blue Pools would "drop [the] counter claim." At the close of the February 18 negotiations, Mr. Lebrecht told Mr. Findley he would have his attorney "get [the settlement agreement] ready as soon as possible."

¶4    The next day, after Mr. Findley met with his attorney regarding the settlement negotiations and terms, his attorney emailed the Lebrechts' attorney and stated, "Mr. Findley feels very misled by the Lebrechts. And he does not wish to enter into any further discussions without counsel present." The Lebrechts' attorney responded,

> As you are aware, the parties reached a settlement yesterday. Indeed, my understanding is that [Mr. Findley] was speaking with you immediately before [he] and the Lebrechts reduced the terms of that agreement to writing, which they then both signed. Utah law is clear that such agreements will be enforced and I will be filing the appropriate motion to enforce with the Court.

¶5    One week later, the Lebrechts moved the trial court to enforce the parties' purported settlement agreement, stating that they "succeeded in coming to a meeting of the minds on the terms of a settlement." In support of their motion, the Lebrechts attached to their memorandum a copy of the Term Sheet, a declaration from their attorney, and a declaration from Mr. Lebrecht. In his declaration, Mr. Lebrecht stated, "[M]y wife and I reached a settlement with Mr. Findley that we put into writing with both me and Mr. Findley drafting parts of the document." He added, "The Agreement was signed by both parties. I wrote several of the main points . . . , and Mr. Findley directly participated in the drafting by writing a term as well."

¶6    Deep Blue Pools opposed the Lebrechts' motion, arguing that it was deceptive and false. More importantly, Deep Blue

Pools revealed that Mr. Findley had recorded the February 18 meeting, and argued that the recording demonstrated that Mr. Lebrecht had assured him the Term Sheet was "not binding" and had threatened him and his company. In its memorandum in opposition to the motion, Deep Blue Pools included a transcript of the meeting, and argued that an enforceable settlement agreement was never reached because the parties did not intend to be bound by the Term Sheet and the purported agreement was the result of undue influence and fraud. Deep Blue Pools also asked the court to sanction the Lebrechts and their attorney for dishonesty.

¶7    During an evidentiary hearing on the Lebrechts' motion, the Lebrechts and Mr. Findley each testified about their negotiations and the trial court received into evidence a copy of the transcript of the recording of the February 18 meeting. At the end of the hearing, the court expressed three specific concerns. It pointed out that "the Lebrechts almost seemed to be in an unfair advantage at least at the start, they seemed to do all the talking, Mr. Findley kind of respond[ed] in short one-word sentences." Next, it expressed concern about "the tenor of the language in the confrontation between Mr. Lebrecht and Mr. Findley." Finally, the court was concerned about Mr. Lebrecht's assurances that the Term Sheet was "not binding."

¶8    After expressing these concerns, the court nevertheless determined that the parties had reached an enforceable settlement agreement. The court found it particularly relevant that Mr. Lebrecht's statements that the Term Sheet was not binding occur in "the middle" of the transcript, after which the parties' negotiations continued. The court stated it was also persuaded by Mr. Findley's expression at the end of the negotiations of his desire to settle the matter. In particular, the court noted that Mr. Findley "seems to stand up for himself, he negotiates . . . , [and] indicates several times that it was in his best interest to get on with this . . . that he would like to settle the matter." The court also pointed out that at the end of

negotiations, Mr. Findley read and agreed that the terms and conditions listed on the Term Sheet were accurate. It stated, "[T]hey end up shaking hands. They affirm, not just in the points [at the end] but the various parts of the transcription, that that is in fact, the agreement." Consequently, the court concluded,

> The issue . . . is whether or not one can take the terms and conditions as they are found on that piece of paper and in the transcription and enforce it against either of the parties. I am convinced that it can, that consideration . . . was given on both sides for the agreement. I'll therefore find that [the Term Sheet] is binding.

The court further stated,

> I find that the parties settled. I find that the terms are enough that they came from meeting of the minds and agreed on the terms. . . . I believe the term settlement agreement is enforceable and valid and binding as it sits now. It was orally agreed upon, it was agreed upon in writing, that's enough to enforce it.

¶9     Deep Blue Pools appeals.


ANALYSIS

I. The Parties Did Not Create an Enforceable Settlement Agreement

¶10    "It is a basic rule that the law favors the settlement of disputes." *Mascaro v. Davis*, 741 P.2d 938, 942 (Utah 1987). In general, a trial court's "enforcement of a settlement agreement will not be reversed on appeal unless it is shown that there was an abuse of discretion." *John Deere Co. v. A & H Equip., Inc.*, 876

P.2d 880, 883 (Utah Ct. App. 1994) (citation and internal quotation marks omitted). But "basic contract principles affect the determination of when a settlement agreement should be so enforced." *Mascaro*, 741 P.2d at 942. "Questions of contract interpretation not requiring resort to extrinsic evidence are matters of law, and on such questions we accord the trial court's interpretation no presumption of correctness." *Zions First Nat'l Bank, N.A. v. National Am. Title Ins. Co.*, 749 P.2d 651, 653 (Utah 1988). "Factual findings, on the other hand, are upheld 'unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.'" *Id.* (quoting Utah R. Civ. P. 52(a)). Here, based on its order and oral ruling, the court's determination rested on a review of the February 18 negotiation transcript and the Term Sheet.[3] "A trial court's finding about whether a party accepted an offer or counteroffer is a finding of fact," usually reviewed for clear error. *Cal Wadsworth Constr. v. City of St. George*, 898 P.2d 1372, 1378 (Utah 1995). But because we are in as good a position as the trial court to examine the transcript of the negotiation and the plain language of the Term Sheet, we owe the trial court no deference in that regard. *Cf. State v. Arriaga-Luna*, 2013 UT 56, ¶ 8, 311 P.3d 1028 (providing no deference to the district court's conclusion that a confession was coerced because it "was based entirely on its review of the interrogation transcripts").

¶11 On appeal, Deep Blue Pools argues the trial court erred when it concluded the parties had a meeting of the minds and the Term Sheet was an enforceable settlement agreement. Specifically, it contends the transcript and the Term Sheet

---

3. The trial court heard testimony regarding the February 18 negotiations. But the court's ruling regarding whether a settlement agreement existed was based only on the documentary evidence; it refers only to the transcript and Term Sheet, makes no credibility determinations, and does not draw on the testimony at the evidentiary hearing.

demonstrate the parties had a mutual understanding that "'a binding contract would not be entered until some point in the future.'" (Quoting *Sackler v. Savin*, 897 P.2d 1217, 1221 (Utah 1995).) It also argues the Lebrechts did not meet their burden to demonstrate the parties had "'proceeded beyond preliminary negotiations for a settlement agreement'" because they each reserved the right to consult their attorneys regarding several of the terms. (Quoting *id.* at 1222.)

¶12    The Lebrechts contend the court correctly determined the parties had reached a binding settlement agreement because they "bargained to resolve their dispute and set forth the essential terms of their resolution in the [Term Sheet]." Specifically, they argue the transcript "establishes that the parties agreed on every term in the [Term Sheet] without reservation." More importantly, the Lebrechts argue that the fact that "the parties intended to incorporate those terms into a final form of agreement does not invalidate their settlement," because neither side expressly conditioned its "assent on a consultation with counsel." Rather, they argue, the essential terms were agreed upon and only left the exact contours of the settlement provisions to be reviewed by counsel.

¶13    Under the principles of basic contract law, "a contract is not formed unless there is a meeting of the minds." *Sackler*, 897 P.2d at 1220. The parties' intentions are controlling. *WebBank v. American Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 17, 54 P.3d 1139. Two elements, among others, are necessary to form an enforceable contract: (1) an offer and (2) an acceptance. *1-800 Contacts, Inc. v. Weigner*, 2005 UT App 523, ¶ 2, 127 P.3d 1241. "An offer is a 'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to the bargain is invited and will conclude it.'" *Id.* (quoting *Engineering Assocs., Inc. v. Irving Place Assocs., Inc.*, 622 P.2d 784, 787 (Utah 1980)). "For an offer to be one that would create a valid and binding contract, its terms must be definite and unambiguous." *DCM Inv. Corp. v. Pinecrest Inv. Co.*, 2001 UT

91, ¶ 12, 34 P.3d 785. "An acceptance must unconditionally assent to all material terms presented in the offer, including price and method of performance, or it is a rejection of the offer." *Cal Wadsworth Constr.*, 898 P.2d at 1376. Thus, a conditional acceptance or a "proposal of different terms from those of the offer constitutes a counteroffer, and no contract arises." *Id.* at 1378. The proponent of the contract "has the burden of showing that an offer and acceptance were more probable than not." *Sackler*, 897 P.2d at 1222.

¶14 "'In determining whether the parties created an enforceable contract, a court should consider all preliminary negotiations, offers, and counteroffers and interpret the various expressions of the parties for the purpose of deciding whether the parties reached agreement on complete and definite terms.'" *1-800 Contacts, Inc.*, 2005 UT App 523, ¶ 4 (quoting *Nunley v. Westates Casing Servs., Inc.*, 1999 UT 100, ¶ 22, 989 P.2d 1077). Accordingly, we first "look to the writing itself to ascertain the parties' intentions." *WebBank*, 2002 UT 88, ¶ 18 (citation and internal quotation marks omitted). "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Id.* ¶ 19 (citation and internal quotation marks omitted). But "if the language of the contract is ambiguous such that the intentions of the parties cannot be determined by the plain language of the agreement, extrinsic evidence must be looked to in order to determine the intentions of the parties." *Id.* (citation and internal quotation marks omitted). Thus, if a settlement agreement is ambiguous, "the court may consider the parties' actions and performance as evidence of the parties' true intention." *Id.*

¶15 The Term Sheet, which the trial court determined memorialized an enforceable oral settlement agreement, is ambiguous on its face. It consists of several bullet-point terms and phrases that, without the assistance of extrinsic evidence,

are vague or unclear. These terms lack specific identifying information, including for which party each term applies. For instance, the first term merely states, "$112,500" with the number "125,000" crossed out below it. Nothing defines this number—it could be a payment, a total price, or a cost. Another example is the next term which states, "$20,000 on signing settlement." From the plain language alone, it is unclear who must pay this amount on signing. Even looking at the Term Sheet as a whole we are unable to identify the obligor. Because of these ambiguities, extrinsic evidence is necessary to determine whether there was a meeting of the minds regarding a settlement agreement.

¶16    The transcript of the parties' negotiations make this an unusual case. It is apparent each party made offers to settle, demonstrating and explicitly stating an interest in resolving their dispute instead of proceeding to trial. Indeed, the parties discussed the terms of a potential settlement agreement for several hours. The Lebrechts first offered to settle the lawsuit in exchange for $150,000. But Mr. Findley refused the offer, and later counteroffered, explaining he would be willing to pay $112,500 if he could pay it over twelve months. The parties even negotiated a payment structure and also discussed at length various conditions they each wanted, including a confidentiality clause, an agreement that Mr. Findley would drop his counterclaims, and an agreement that the Lebrechts would not file a complaint regarding Mr. Findley's business license with the Division of Occupational and Professional Licensing. Our review of the transcript suggests they agreed on many of the essential terms and conditions, and at one point when Mr. Lebrecht stated he thought they reached "the terms of the settlement," Mr. Findley agreed.

¶17    But each time the parties appeared to agree on a term, they continued to negotiate other terms or conditions, sometimes revisiting terms previously decided. For example, toward the end of the negotiations, Mr. Findley stated he wanted to settle

because he "just needed to be done" with the lawsuit, but immediately after this, Mr. Lebrecht attempted to renegotiate the payment from $112,500 to $125,000. Several pages later in the transcript, the parties agreed to delay signing the settlement agreement until it could be drafted and so that Mr. Findley could discuss some of the terms with his attorney. This demonstrates that both parties contemplated additional steps before the agreement was complete and final.

¶18    The Restatement of Contracts states, with regard to preliminary negotiations, that "[a] manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." Restatement (Second) of Contracts § 26 (Am. Law Inst. 1981); *accord Sackler v. Savin*, 897 P.2d 1217, 1221 (Utah 1995). It also explains that the parties' manifestation of "an intention to prepare and adopt a written" agreement "may show that the [parties'] agreements are preliminary negotiations," rather than a contract. Restatement (Second) of Contracts § 27. This makes sense considering "[p]arties who plan to make a final written instrument as the expression of their contract, necessarily discuss the proposed terms of the contract before they enter into it and often, before the final writing is made, agree upon all the terms which they plan to incorporate therein." *Id.* § 27 cmt a. "'[I]f an intention is manifested in any way that legal obligations between the parties shall be deferred until the writing is made, the preliminary negotiations and agreements do not constitute a contract.'" *1-800 Contacts, Inc. v. Weigner*, 2005 UT App 523, ¶ 7, 127 P.3d 1241 (alteration in original) (quoting *R.J. Daum Constr. Co. v. Child*, 247 P.2d 817, 820 (Utah 1952)).

¶19    Considering both the Term Sheet and the February 18 negotiation transcript as a whole, it is clear the parties expected to be bound by a written agreement, not an oral one. Mr. Findley stated that, considering Mr. Lebrecht is an attorney, he felt at a

disadvantage in the negotiations. For example, near the beginning of the transcript, Mr. Findley stated, "You know, the—the benefit . . . you and [Mrs. Lebrecht] have is that you know a little bit—you're more versed in what's going on in this whole courtroom proceeding and everything else. . . . I try to depend on an attorney to help me make the decisions that are correct." At several points, Mr. Findley said he did not understand certain proposed terms. For example, with regard to the Lebrechts' term "confession of judgment with fraud," he stated, "I don't understand what it is" and "again, I am not an attorney." Later, he stated, "I don't even necessarily know what the—the term 'confession of judgment' entails or what . . . but I assume that when it gets written up . . . then [my attorney] and I will have an opportunity to sit down and he can explain it thoroughly." Mr. Lebrecht responded, "Absolutely." Indeed, Mr. Findley later stated he thought they were "close to making this arrangement" but he would have to review it with legal counsel to make sure nothing was missing. Although Mr. Findley did not explicitly state he conditioned his assent on consultation with counsel, he plainly stated on several occasions that he wanted to discuss the negotiated terms with his lawyer before signing an agreement. Thus, Mr. Findley's lack of understanding and expression of his intention to meet with his attorney before signing a written agreement leads us to believe he did not unconditionally assent to all material terms discussed in the parties' negotiations.

¶20   The Lebrechts' statements also demonstrate they were negotiating for a written settlement agreement to be signed in the future. Near the end of the negotiations, Mr. Findley suggested they delay "a bit further in signing" so he could try to negotiate a deal with his subcontractors. But Mr. Lebrecht responded, "I don't want to delay the signing of the settlement agreement." After proposing that their agreement include a mutual confidentiality clause, Mr. Lebrecht stated, "[W]e'll just see what that looks like in writing." Mr. Findley suggested that his attorney may "have a way to propose it in wording." Mrs.

Lebrecht then asked, "So do you want it delayed by one week?" Mr. Findley replied, "Yeah, one week's fine."

¶21   More than halfway through the negotiations, Mr. Findley asked if his attorney needed to draft the settlement agreement, but Mr. Lebrecht responded, "I'd probably like to have our guy do it." Then, Mr. Lebrecht asked Mr. Findley to initial the Term Sheet, stating,

> Not that it's binding, but that way . . . I can give it to [my] guy . . . . [W]e'll make—get a copy made, you give it to [your attorney], and . . . at least this is what we agreed to as we left here. Obviously, it's not binding . . . .

Mr. Findley then asked, "[H]ow quick can your guy write it up? I mean, . . . I can make it a point to go and meet with [my attorney] today." Mr. Lebrecht responded that it could happen within the week. Then, he stated, "And if we don't sign the settlement agreement, then we're back where we are right now. And that would give us a week to get it drafted, passed back and forth, and executed." After Mr. Findley acknowledged the parties had reached some essential terms, Mr. Lebrecht stated "[T]hat's part of the reason why we put this here and you can kind of initial it. And then you give this to [your attorney], this is what we agreed to, you know."

¶22   Contrary to his position on appeal, Mr. Lebrecht's statements during negotiations demonstrate he understood the parties would not enter a binding agreement until sometime in the future. *See Sackler*, 897 P.2d at 1221 (explaining that a party's expression of willingness to enter into a bargain is not an offer if it is clear that the party does not intend to conclude a bargain until he or she has made a further manifestation of assent). Indeed, he assured Mr. Findley the Term Sheet was not binding. "Neither real nor apparent intention that a promise be legally binding is essential to the formation of a contract, but a

manifestation of intention that a promise shall not affect legal relations may prevent the formation of a contract." Restatement (Second) of Contracts § 21. Mr. Lebrecht also acknowledged that he understood there would be further negotiations, or a "back and forth" of the written settlement agreement, until it was executed later that week.

¶23    Although the parties may have agreed on some of the essential terms of their settlement, these agreements are not dispositive. Where it is apparent from their negotiations "'that the determination of certain details is deferred until the writing is made out'" or "'if an intention is manifested in any way that legal obligations between the parties shall be deferred until the writing is made, the preliminary negotiations and agreements do not constitute a contract.'" *R.J. Daum Constr. Co. v. Child*, 247 P.2d 817, 820 (Utah 1952) (quoting Restatement (First) of Contracts § 26 cmt. a (Am. Law Inst. 1932)). As discussed above, the parties agreed to defer certain terms, such as a confidentiality clause, until an agreement was drafted. Mr. Lebrecht assured Mr. Findley the Term Sheet was not binding and acknowledged that Mr. Findley wanted to have his attorney review some of the terms before executing a settlement agreement. At no point did either party definitely agree their dispute was settled; rather, they made clear their intention to enter into a written settlement agreement in the future. Thus, the parties did not merely intend to memorialize an oral contract but planned to defer their legal obligations until the settlement was drafted. Furthermore, even if the Lebrechts manifested an intention to be bound by the parties' oral agreements, they have failed to meet the burden of showing that Mr. Findley's acceptance of the terms reached in their preliminary negotiations was more probable than not. *See Sackler v. Savin*, 897 P.2d 1217, 1222 (Utah 1995). Because these were merely preliminary negotiations regarding terms of a future settlement agreement, the parties did not create an enforceable contract.

## II. The Lebrechts' Motions and Conduct Do Not Warrant Sanctions

¶24 Deep Blue Pools argues the trial court erred in denying its motion to sanction Mr. Lebrecht for making false statements. It argues that Mr. Lebrecht's sworn declaration was inconsistent with his negotiations with Mr. Findley. Deep Blue Pools further argues that the court erroneously "perceived the parties as being on equal footing" because Mr. Lebrecht is an experienced transactional lawyer. It also argues that Mr. Lebrecht's assurances that the Term Sheet was "not binding" conflict directly with his declaration that the parties created a binding settlement agreement.

¶25 Deep Blue Pools asked the court to sanction Mr. Lebrecht and his attorney under rule 11 of the Utah Rules of Civil Procedure.[4] Rule 11 states, "By presenting a pleading, written motion, or other paper to the court . . . , an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief" the claims or other legal

---

4. We note that although it asked the court for sanctions under rule 11 of the Utah Rules of Civil Procedure, Deep Blue Pools's request was not properly initiated by following the requirements of rule 11. *See* Utah R. Civ. P. 11(c)(1)(A) (providing that "a motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate" subsection (b)). Here, Deep Blue Pools's request for sanctions was not filed as a separate motion but was raised in its opposition to the Lebrechts' motion to enforce. Because neither party raises an argument on appeal regarding whether Deep Blue Pools properly initiated its rule 11 motion, we address the merits of the parties' arguments, interpreting Deep Blue Pools's argument for sanctions as an invitation to the court to enter an order for sanctions on its own initiative.

contentions are supported by existing law and have evidentiary support. Utah R. Civ. P. 11(b). This rule gives the court discretion to "impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b)." *Id.* R. 11(c).

¶26    Different standards of review apply to our review of a trial court's determination of whether sanctions are appropriate under rule 11 of the Utah Rules of Civil Procedure. *Archuleta v. Galetka*, 2008 UT 76, ¶ 6, 197 P.3d 650. "Findings of fact are reviewed under a clear error standard, while conclusions of law are reviewed for correctness." *Id.* "The trial court's determination regarding the type and amount of sanctions to be imposed is reviewed for abuse of discretion." *Id.* Generally,

> Decisions regarding rule 11 sanctions are best left in the hands of the trial court. We therefore accord reasonable discretion to the trial court to determine when sanctions are useful and appropriate. When applying the appropriate standards of review, we grant considerable deference to the trial court's factual findings and some deference to the trial court's application of the facts when reaching its legal conclusions of whether rule 11 has been violated. We also afford substantial deference to the trial court's ultimate determination of when, and to what extent, sanctions are a useful tool in controlling abuses of the judicial process.

*Id.* ¶ 7. Accordingly, "it remains within the court's discretion to apply sanctions under rule 11(c) even if it finds a violation of rule 11(b)." *See Crank v. Utah Judicial Council*, 2001 UT 8, ¶ 34, 20 P.3d 307.

¶27    Here, the court determined that it "did not find anything, either in the testimony or in the transcript, that [one] really could lay [a] finger on as being false as compared to two parties

making a reasonable negotiation without attorneys present." Although we disagree with the court's determination that the parties had an enforceable settlement agreement, nothing suggests Mr. Lebrecht lacked an honest belief that the parties had reached an agreement by the conclusion of the February 18 negotiations or that their attorney filed the motion to enforce the Term Sheet in bad faith. Given the high level of deference afforded to the trial court's determination, we are not persuaded it abused its discretion when it declined to sanction Mr. Lebrecht and his attorney under rule 11.

CONCLUSION

¶28 Because the parties mutually understood a settlement agreement would not be entered into until some point in the future, we conclude it was clear error for the trial court to find that the parties entered into an enforceable settlement agreement. Deep Blue Pools has failed to persuade us the court exceeded its discretion when it declined to sanction Mr. Lebrecht and his attorney. We therefore affirm the court's decision to reject Deep Blue Pools's request for sanctions and reverse the court's determination that the parties' negotiations created an enforceable settlement agreement.

_____